IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


ALVA CAMPBELL,                  :

       Petitioner,         :

                                     Case No. 2:05cv193

       vs.               :

                               JUDGE WALTER HERBERT RICE

MARGARET BRADSHAW, WARDEN,   :

       Respondent.       :

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART PETITIONER'S OBJECTIONS (DOC. #61) TO THE REPORT AND RECOMMENDATIONS OF THE UNITED STATES MAGISTRATE JUDGE(DOC. #59); REPORT AND RECOMMENDATIONS (DOC. #59) ADOPTED IN PART, AS LIMITED AND SUPPLEMENTED HEREIN, AND REJECTED IN PART; CAPTIONED CAUSE REMANDED TO MAGISTRATE JUDGE FOR LIMITED PURPOSE; CERTIFICATE OF APPEALABILITY TO BE GRANTED IN PART AND DENIED IN PART AT APPROPRIATE TIME; PETITIONER GIVEN LEAVE TO APPEAL IN FORMA PAUPERIS WHEN FINAL JUDGMENT IS ENTERED; DIRECTIVE TO MAGISTRATE JUDGE

---

A Franklin County, Ohio, Grand Jury indicted Petitioner Alva Campbell

("Petitioner" of "Campbell") for a number of crimes, including four counts of

aggravated murder, each of which carried death penalty specifications.  Thereafter,

a jury convicted him of all charged offenses and recommended that he be

sentenced to death.  The trial judge concurred in the jury's recommendation and

imposed a death sentence.  He then appealed his conviction and the imposition of

the death penalty to the Ohio Supreme Court.  See State v. Campbell, 90 Ohio

St.3d 320, 738 N.E.2d 1178 (2000), cert. denied, 533 U.S. 956 (2001).  Therein,

the court reviewed the facts and circumstances surrounding the prosecution:

> In 1972, Campbell was convicted of murder in the first degree under former R.C. 2901.01 and sentenced to life imprisonment.  Twenty years later, he was paroled.  In 1997, Campbell was arrested in Franklin County on a charge of aggravated robbery.  He was held at the Jackson Pike Jail pending arraignment.
>
> On April 2, 1997, Deputy Sheriff Teresa Harrison was assigned to take Campbell to court, a task complicated by Campbell's confinement to a wheelchair.  Two weeks before, jail doctors had wrongly diagnosed Campbell as having "hysterical paralysis"; in fact, he was faking.  Not knowing this, however, Harrison placed Campbell in a van and drove him into downtown Columbus.
>
> Around 12:30 p.m., Charles Dials was paying a ticket at the traffic bureau of the Franklin County Municipal Court.
>
> At about the same time, Deputy Harrison was parking the van in a loading dock at the courthouse.  Harrison got out of the van and began to assist Campbell.  Suddenly, Campbell attacked her. He beat her severely, stole her service pistol, and fled.
>
> Charles Dials had just left the traffic bureau and was driving west on Fulton Street when Campbell ran outside.  Campbell dashed into the street, stopped Dials's truck, and pulled open the driver's door.  He told Dials, "I don't want to hurt you; just move over."  And Campbell drove off, with Dials his prisoner.
>
> Campbell drove to a K-Mart at Williams Road and South High Street.  He parked there and talked with Dials, telling him not to be nervous.  Then he drove back to Central Avenue, turned onto a side street, and parked near a factory.  There, Campbell took Dials's money and made Dials exchange clothes with him.
>
> Next Campbell drove back to High Street, where he bought a forty-ounce bottle of beer at a drive-through.  He then returned to the K-Mart.  There he sat talking with Dials "probably a good 2 hours," according to his confession.
>
> When a helicopter circled overhead, Campbell became nervous and turned on the radio to hear the news.  An announcer reporting on the escape mentioned that Campbell had commandeered a red truck.  Dials said, "That's you, ain't it?"  Campbell admitted it was, and they talked a while longer.
>
> Campbell then moved the truck behind the K-Mart, driving around the back lot three times before he finally chose a parking space.  He said,

"Charlie, I got to get another car."  Then he told Dials to "get on the floor board of his truck."  Dials obeyed, and Campbell shot him twice: once in the face and once in the neck.  The shots were fired from at least six inches away, but no more than two or three feet.  Campbell tried to cover the corpse with Dials's coat.

Campbell then drove around to K-Mart's main lot and waited.  While he sat waiting, Katie Workman drove in.  She parked near the truck and began to get out of her car.  As she opened her door, Campbell ran up to her car and put the gun to her head. "Move over …," he said. "I've just killed one man."  Workman moved over, and Campbell screamed, "Give me your money, your keys."  Workman threw her wallet and keys at Campbell and jumped out of the car.  Campbell immediately drove away and went to the nearby Great Southern Shopping Center.

Around 3:20 or 3:30 p.m., James Gilliam was parked outside the Body Fit gym at the Great Southern, waiting for someone.  When Campbell arrived, Gilliam was sitting in his car with the door open.  Campbell forced his way into the space between Gilliam's car and another car.

Suddenly, Gilliam felt the car door pressing against his legs.  Then he felt a gun against his head and heard a man say: "[D]o you want to die? Get in the car and move over."  Gilliam looked up and saw a man he later identified as Campbell.

Gilliam pushed the door back at Campbell and stood up. Campbell said, "Get in the car and move over.  I've done killed two people, and I'm not afraid to do it again." Gilliam backed away, then turned and ran.

Gilliam's keys weren't in the ignition, so Campbell jumped back into Workman's car.  He drove around for a while, at one point buying another forty-ounce beer at a drive-through.  Campbell drove off in haste, then abandoned the car in an alley and fled on foot.  Campbell hid in a tree, but the tree's owner saw and reported him.  Police soon surrounded the tree.

Seeing now that he was cornered, Campbell dropped the gun and surrendered.  At 9:00 p.m., detectives from the Columbus Police Department and the Franklin County Sheriff's Office interrogated him on videotape.  He gave the detectives a lengthy and detailed confession.

Campbell was indicted on four counts of aggravated murder.  Count One charged aggravated murder under R.C. 2903.01(A) (prior calculation and design).  Counts Two through Four charged aggravated murder under R.C. 2903.01(B) (felony-murder): Count Two was predicated on murder during an aggravated robbery, Count Three on murder during a kidnapping, and Count Four on murder during an escape.  Each aggravated murder count carried four death specifications: murder to escape detection, R.C. 2929.04(A)(3); felony-murder predicated on aggravated robbery, R.C. 2929.04(A)(7); felony-murder predicated on kidnapping, R.C. 2929.04(A)(7); and having a prior murder conviction, R.C. 2929.04(A)(5).

The indictment contained ten other counts: four counts of aggravated robbery, two counts of attempted kidnapping, and one count each of kidnapping, felonious assault, escape, and having a weapon under disability.

Campbell was convicted of all counts and specifications, but the trial judge merged the (A)(3) specifications into the felony-murder specifications. Thus, only three specifications were presented to the jury in the penalty phase. After a mitigation hearing, the jury recommended death. The trial judge merged the aggravated murder counts and sentenced Campbell to death on Count Three.

Id. at 320-22, 738 N.E.2d at 1186-87.

Although the Ohio Supreme Court affirmed the Petitioner's convictions, that court vacated the imposition of the death penalty, because the trial court had failed to comply with the allocution provisions of Rule 32(A)(1) of the Ohio Rules of Criminal Procedure. Therefore, that court remanded the matter to the trial court for resentencing (i.e., to decide whether to accept the jury's recommendation of death or to impose some lesser sentence), after it had complied with Rule 32(A)(1). On remand, the trial court imposed the death penalty on Campbell again, after having provided him the opportunity to speak. The Ohio Supreme Court subsequently affirmed the sentence imposed by the trial court. State v. Campbell, 95 Ohio St.3d 48, 765 N.E.2d 334 (2002).

In addition, the Petitioner filed a petition for post-conviction relief under § 2953.21 of the Ohio Revised Code in the Franklin County Common Pleas Court. That petition was denied without an evidentiary hearing. The Franklin County Court of Appeals affirmed, concluding that some of his claims were barred by the doctrine of res judicata and denying others on the merits. State v. Campbell, 2003 WL 22783857 (Ohio App. 2003). The Ohio Supreme Court denied his request for further review. State v. Campbell, 102 Ohio St.3d 1470, 809 N.E.2d 1158 (2004).

The Petitioner then initiated this action, seeking a writ of habeas corpus under 28 U.S.C. § 2254.  In his Petition (Doc. #12), Campbell has set forth 12 claims or grounds for relief, many of which contain sub-claims and even sub-sub claims.  In addition, the Magistrate Judge, with the agreement of the Respondent, has granted Petitioner leave to amend his Petition, in order to add sub-claim 4 to Ground 1.  See Doc. #23.  This matter was referred to United States Magistrate Judge Michael Merz for a report and recommendations.  After permitting the Petitioner to conduct discovery and holding an oral and evidentiary hearing, Judge Merz filed a 117-page Report and Recommendations, recommending that this Court deny Campbell the requested writ of habeas corpus.  See Doc. #59.  The Petitioner has filed Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), and the Respondent has filed a Memorandum in Opposition (Doc. #64).[1]  As a means of analysis, the Court will review the standards which govern its review of both Judge Merz's Report and Recommendations and the decisions of the state courts denying the Petitioner's claims that underlie this particular action, following which it will turn to the Petitioner's Objections (Doc. #61) to the Magistrate Judge's filing.

The Sixth Circuit has indicated that a District Court must apply a de novo standard of review to such a judicial filing.  Flournoy v. Marshall, 842 F.2d 875 (6th

---

[1]The Respondent filed her memorandum on January 31, 2008.  In accordance with S.D. Ohio Civ. R. 7.2(a)(2), the Petitioner had eleven days, or until February 11, 2008, within which to file a reply memorandum.  See Fed. R. Civ. P. 6(a) (providing that, when computing time under, inter alia, local rules, the day that causes a period to begin to run is not counted, while the last day of the period is counted).  The Petitioner has not filed either a reply memorandum or a request to extend the time in which he had to file same.  This matter has, therefore, been pending before the undersigned for a period of 25 days, including Saturdays, Sundays and holidays.

Cir. 1988).  Accordingly, this Court reviews both Judge Merz's factual findings and

his legal conclusions de novo.

    Herein, this Court must apply the version of 28 U.S.C. § 2254(d), added by

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat.

1214, which provides:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with
> respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim−
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court clarified the

meaning of the post-AEDPA version of § 2254(d).  In particular, the Court noted

that § 2254(d)(1) contains two clauses, to wit: the "contrary to" and

"unreasonable application" clauses, which have independent meanings.  Id. at 404.

With respect to the "contrary to" clause, the Court noted that "[a] state[]court

decision will certainly be contrary to our clearly established precedent if the state

court applies a rule that contradicts the governing law set forth in our cases," and

that "[a] state[]court decision will also be contrary to this Court's clearly

established precedent if the state court confronts a set of facts that are materially

indistinguishable from a decision of this Court and nevertheless arrives at a result

different from our precedent."  Id. at 405-06.  The Supreme Court held that the

"unreasonable application" clause will be violated, if a state court "correctly

identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08.  The Williams Court explained that a state court will have unreasonably applied Supreme Court precedent, if it "unreasonably refuses to extend that [precedent] to a new context where it should apply." Id. at 407.  The Supreme Court also indicated that the inquiry is an objective one and, thus, rejected the argument that the subjective, "reasonable jurist" standard should be applied. Id. at 409-10.  Although the Supreme Court did not define "objectively unreasonable," it did indicate that an unreasonable application of federal law is different from an incorrect application of same. Id. at 410.  Thus, a writ of habeas corpus will not issue merely because the state court applied federal law incorrectly or erroneously. Id. at 411.  The Williams Court also indicated that "clearly established federal law" is comprised of "rules of law [that] may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule." Id. at 382.  In contrast, a rule established following a petitioner's conviction "that 'breaks new ground or imposes a new obligation on the States or the Federal Government'" is not considered to be clearly established for the purposes of the AEDPA. Id. at 381 (quoting Teague v. Lane, 489 U.S. 288, 301 (1989)).  In determining whether a state court decision was contrary to or an unreasonable application of clearly established federal law, this Court may look only to "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state[]court decision." Id. at 412.  See also, Parker v. Renico, 506 F.3d 444, 447-48 (6th Cir. 2007) (reviewing the applicable standards to apply under § 2254(d)(1), as

interpreted by the Supreme Court in <u>Williams</u>); <u>Varner v. Stovall</u>, 500 F.3d 491, 494-95 (6th Cir. 2007) (same).

Although the Report and Recommendations does not address the issue of whether the Petitioner should be granted a certificate of appealability on any one or more of his claims or grounds for relief, this Court will resolve that question herein. Therefore, the Court also reviews the standards applicable to the grant or denial of same.  The requirement for a certificate of appealability is found in 28 U.S.C. § 2253(c), which provides:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

In <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000), the Supreme Court explained that an applicant for a certificate of appealability could make "a substantial showing of the denial of a constitutional right," as required by § 2253(c)(2), in accordance with the standard adopted in <u>Barefoot v. Estelle</u>, 463 U.S. 880 (1983).  529 U.S. at 483-84.  Thus, the <u>Slack</u> Court explained that when the District Court has rejected a petitioner's constitutional claim on the merits, the petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," before a certificate of appealability can issue.  <u>Id</u>. at

484. With respect to instances in which the District Court denies relief on procedural grounds, the Slack Court held:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Id. In Miller-El v. Cockrell, 537 U.S. 322 (2003), the Supreme Court reaffirmed the standards for the granting of a certificate of appealability it had established in Slack.

As indicated, the Petitioner has set forth 12 claims or grounds for relief, in his Petition (Doc. #12) and his amendment thereto (Doc. #23). Many of the grounds for relief contain sub-claims and even sub-sub claims  The Magistrate Judge recommended that this Court dismiss all claims, sub-claims and sub-sub-claims.  See Doc. #59.   The Petitioner has not objected to the recommendation of Judge Merz that this Court dismiss sub-claims 2, 3 and 4 of Ground 1; sub-claim 2 of Ground 2; sub-claims 1, 3 and 4 of Ground 3; Ground 6, as it relates to the failure to grant him a CT scan; and the entirety of Grounds 7, 8, 9, 10 and 12. See Doc. #61 at 1.  This Court has conducted a de novo review of those claims, and, for the reasons set forth in the Report and Recommendations of the Magistrate Judge (Doc. #59), concludes that the Petitioner is not entitled to relief on any of those grounds.  The Court adopts that judicial filing as it relates to those claims.  Accordingly, the Court dismisses sub-claims 2, 3 and 4 of Ground 1; sub-claim 2 of Ground 2; sub-claims 1, 3 and 4 of Ground 3; Ground 6, as it relates to

the failure to grant him a CT scan; and the entirety of Grounds 7, 8, 9, 10 and 12. Moreover, since reasonable jurists would not find this Court's assessment of those claims debatable or wrong, it will not grant Petitioner a certificate of appealability on any of those claims or Grounds.[2]

Campbell has objected only to the Magistrate Judge's recommendations concerning sub-sub claims 1.1 and 1.2 of Ground 1; sub-claim 1 of Ground 2; sub-sub-claims 2.1 and 2.2 of Ground 3; and Grounds 4 (and the two sub-claims contained therein) and 5; Ground 6, as it relates to the preclusion of voluntary intoxication as evidence of mitigation; and Ground 11.  See Doc. #61 at 1.  As a means of analysis, this Court rules on those objections in the above order. However, many of the Petitioner's claims are predicated on the proposition that he was denied effective assistance of counsel, as guaranteed by the Sixth Amendment to the United States Constitution, as a result of error committed by his trial counsel.[3]  Therefore, the Court will initially review the standards applicable to all claims of ineffective assistance of such counsel.

---

[2]Although the statute, § 2253(c)(2), requires "a substantial showing of the denial of a constitutional right," before a certificate of appealability can be granted, the Supreme Court has interpreted that language as requiring the showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," before such a certificate can issue.  Slack, 529 U.S. at 484.  Therefore, when deciding whether the Petitioner is entitled to a certificate of appealability on any one or more or all of his claims, this Court considers whether he has shown that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," rather than focusing on the statutory language.

[3]Petitioner was represented by two lawyers during his trial.  On appeal, he was represented by different counsel, who continue to represent him in this proceeding.

A claim of ineffective assistance of counsel under the Sixth Amendment has two components, to wit: 1) deficient performance by counsel and 2) prejudice to the defendant as a result. Strickland v. Washington, 466 U.S. 668, 687 (1984). In Strickland, the Court said that establishing that counsel's performance was deficient "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. The Strickland Court explained further:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ....

Id. at 689. The Strickland Court also explained the prejudice prong of the test adopted therein:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694.

I.  Sub-Sub-Claims 1.1 and 1.2  of Ground 1: Ineffective Assistance of Counsel during the Penalty Phase

With Ground 1 of his Petition, Campbell alleges that errors and omissions of his trial counsel during the penalty phase of his trial denied him the right to effective assistance of counsel.  See Doc. #12-3 at 1.  With sub-claim 1, he asserts that trial counsel presented a penalty phase case that was grossly counter-productive.  Id.  Sub-sub-claims 1.1 and 1.2 contain two examples of this allegedly grossly counter-productive penalty phase case.  Id. at 1-3.


A.  Sub-Sub-Claim 1.1 of Ground 1: Introduction of the Videotape of Security Measures

In sub-sub-claim 1.1 of Ground 1, the Petitioner alleged that the attorneys representing him during his trial failed to provide effective assistance of counsel during the penalty phase, as a result of showing the jury a videotape of the security measures employed by Sheriff's deputies when they moved the Petitioner. Doc. #12-3 at 1.  Petitioner asserted that the videotape was irrelevant, given that it showed security measures in a county jail instead of in a state prison, where he would be incarcerated, if he were not sentenced to death.  Id.  The Petitioner also contended that the videotape introduced future dangerousness into the penalty phase, even though it is neither a mitigating factor nor an aggravating circumstance.  Id.

During Campbell's direct appeal, the Ohio Supreme Court rejected this claim, concluding that counsel's decision to introduce the videotape was reasonable.  The court explained:

> Campbell contends that counsel pursued a counterproductive penalty-phase strategy. He cites their introduction of Defense Exhibit B, a videotape showing the precautions the Franklin County Jail was taking to prevent another escape. According to Campbell, the video raised the issue of future dangerousness. However, given the facts, counsel could reasonably fear that future dangerousness would be on the jurors' minds no matter what. Hence, it was logical to try to allay that concern by showing that precautions can be taken to prevent Campbell from making another escape.

90 Ohio St.3d at 339, 738 N.E.2d at 1199. Judge Merz recommended that the Court dismiss this claim, because the decision of trial counsel to show the videotape was sound trial strategy. See Doc. #59 at 31-32. That judicial officer also pointed out that William Mooney ("Mooney"), one of the attorneys who represented Campbell during his trial, testified during the oral and evidentiary hearing that he considered his and his co-counsel's decision to play the videotape to the jury to be the exercise of reasonable, professional judgment.[4] See Transcript of August 17, 2007, Oral and Evidentiary Hearing (Doc. #57) at 188.

In his Objections, the Petitioner argues that counsel's performance in this regard was deficient, because the videotape was not "fodder" for mitigation, given that he would serve his time in a state penal institution if convicted, rather than in the Franklin County Jail. Doc. #61 at 3. This Court agrees with the factual predicate of Campbell's contention. Nevertheless, it cannot accept Petitioner's implicit argument that showing a videotape portraying the security measures in the County Jail, rather than a videotape of the security measures that would be utilized, after he had been incarcerated in a state penal institution, renders the decision of the Ohio Supreme Court rejecting this claim an unreasonable application

---

[4]When he testified, Mooney was employed by the Office of the Ohio Public Defender, which represents the Petitioner herein.

of Strickland.[5]  As that court indicated, Campbell's future dangerousness was going to be on the minds of the jury, regardless of whether that videotape was played, making it logical to attempt to allay the jury's potential concern that he might escape again and go on another crime spree.[6]  Applying the highly deferential standard of judicial scrutiny and the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance (as required by Strickland), this Court concludes that counsel's decision to introduce the videotape, even though it may not have been "perfect" evidence, was not deficient.  It bears emphasis that the jury was well aware that the Petitioner had escaped prior to murdering Charles Dials ("Dials"), since escape was one of the aggravating factors that the jury had found during the guilt phase of the trial.

Having concluded that Campbell has failed to establish the deficiency prong of Strickland,[7] this Court overrules Petitioner's Objections (Doc. #61) to the Report

_____

[5]There is no basis for arguing that the decision of the Ohio Supreme Court in this regard was contrary to Strickland.

[6]Rather than challenging that premise, Petitioner effectively adopts it by arguing in another portion of his Objections:

> First, the Magistrate Judge's findings ignore the reality of the case presented at trial.  The facts of this crime established that Campbell was potentially dangerous—he committed aggravated murder after escaping from the Franklin County Jail.  State v. Campbell, 738 N.E.2d 1178, 1186-87 (Ohio 2000).

Doc. #61 at 11.

[7]The Magistrate Judge also recommended that this Court hold that the Petitioner had failed to establish the prejudice prong of the Strickland test.  See Doc. #59 at 31.  Campbell has objected to that particular recommendation.  See Doc. #61 at 1-3.  Given this Court's conclusion that the rejection of this claim by the Ohio Supreme Court, because counsel's performance was not deficient, was not contrary to nor an unreasonable application of Strickland, it is not necessary to consider the question of whether the introduction of the videotape was prejudicial.

and Recommendations of the Magistrate Judge (Doc. #59), as that judicial filing

relates to sub-sub-claim 1.1 of Ground 1. In addition, concluding that reasonable

jurists would not find this Court's assessment of this constitutional claim debatable

or wrong, the Court denies Petitioner a certificate of appealability on same.


B. Sub-Sub-Claim 1.2 of Ground 1: Introduction of Petitioner's Prison Records

    In sub-sub-claim 1.2 of Ground 1, the Petitioner alleged that he was denied

effective assistance of counsel during the penalty phase of his trial, when they

introduced his (Petitioner's) prison records as an exhibit during that phase.

Doc. #12-3 at 2-3. In particular, Campbell contends that the introduction of this

exhibit "opened the door" for the state to introduce all manner of otherwise

irrelevant evidence which "built the State's case for death." Id. at 2. According to

Petitioner, by so "opening the door," his trial counsel permitted the prosecution to

introduce the following otherwise inadmissible evidence: the facts and

circumstances of his previous murder conviction; the facts surrounding his

shooting of a police officer in 1972; poems he had written while in prison, rooting

for an escaped prisoner; that he had made a number of visits to outside medical

facilities as a result of self-inflicted wounds; that he would not be eligible for parole

until 2085, regardless of the penalty imposed by the jury, allowing "the jury to

infer that the death penalty was the only real sentencing option available to it;"

that he had threatened a deputy sheriff; that "dangerous contraband" was found in

his cell at the county jail; that he had made additional efforts to escape after

August 2, 1997, the day upon which he escaped and murdered Dials; and that he

believed he would get the death penalty. Id.

During Campbell's direct appeal, the Ohio Supreme Court disposed of this contention in the following manner:

> Next, he argues that the defense should not have introduced Campbell's prison records. However, Dr. Smalldon consulted and relied upon those records in diagnosing Campbell. Campbell does not contend that the defense should have dispensed with Smalldon's testimony, which was critical to the case for life, just to keep his prison records out of the trial.
> Next, he argues that no rational attorney would attempt to present good behavior in prison as a mitigating factor in a case like this, where the murder was committed after the defendant's escape from jail. We disagree. Reasonable attorneys could easily conclude that no legitimate mitigating factor should be withheld from the jury.

Id. at 339-40, 738 N.E.2d at 1200. Judge Merz initially indicated that Petitioner's trial counsel "did not exercise the possible best judgment in direct by 'opening the door' to the potentially damaging evidence." See Doc. #59 at 33. Nevertheless, that judicial officer recommended that the Court deny this claim, because the decision of Petitioner's trial counsel to introduce the prison records was not deficient, since it was consistent with their strategy of gaining credibility with the jury in an effort to get a verdict of life. Id. In addition, the Magistrate Judge concluded that, even if trial counsel's performance was deficient, the Petitioner had failed to establish the prejudice prong of Strickland, i.e., a reasonable probability that the results of his trial would have been different, but for counsel's error. Id.

In his Objections, Petitioner argues that the performance of his trial counsel was deficient, because they did not decide to use their client's prison records as part of a "credibility" strategy. See Doc. #61 at 3. Petitioner argues that, to the contrary, counsel decided to use this evidence as a result of giving it little thought. Id. He contends that this is demonstrated by the fact that his trial counsel

objected to the prosecution's use of some of the damaging evidence, only to be rebuffed, because that evidence was contained in his prison records which his trial counsel had introduced.[8] Id. (citing 21 Trial Transcript ("Tr. Trans.") at 857).

The foregoing arguments do not cause this Court to conclude that the decision of the Ohio Supreme Court was contrary to or an unreasonable application of Strickland. Mooney testified that he and co-counsel did not decide to introduce Petitioner's prison records into testimony until after they had conducted an investigation, including a complete review of those records, and that they made that decision understanding that the prison records contained information that was negative to their client. See Transcript of August 17, 2007, Oral and Evidentiary Hearing (Doc. #57) at 188-89. Given that testimony, this Court is constrained by the observation made by the Supreme Court in Strickland, that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. Moreover, the cases cited by Petitioner do not remotely suggest that the performance of his trial counsel was deficient. For instance, in Rickman v. Bell, 131 F.3d 1150 (6th Cir. 1997), cert. denied, 523 U.S. 1133 (1998), the Sixth Circuit held that the petitioner had been denied effective assistance of counsel, when the attorney representing him in his trial, which resulted in the imposition of the death penalty, ceased advocating for him after becoming convinced that his client was guilty. Herein, the Petitioner does not argue that his trial counsel stopped advocating on his behalf. Rather, he

---

[8]Trial counsel's objection to the prosecution's use of the evidence occurred, after the close of evidence for the penalty phase, in a discussion between the trial court and counsel over jury instructions for that phase and what would constitute proper closing argument by the prosecution.

contends that their advocacy was predicated upon the wrong evidence.  The decision of the Sixth Circuit in  Ramonez v. Berghuis, 490 F.3d 482 (6th Cir. 2007), is also inapposite, given that the Sixth Circuit concluded that the performance of petitioner's trial counsel had been deficient therein as a result of failing to interview three potential witnesses whom he had identified as possibly possessing information that could be helpful to his client.  Herein, this Court has found that the attorneys who represented Petitioner during his trial did investigate his prison records before introducing them into evidence.[9]

Having concluded that Campbell has failed to demonstrate that the performance of his trial counsel was deficient as a result of introducing his prison records into evidence,[10] this Court overrules the Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate to sub-sub-claim 1.2 of Ground 1.  Nevertheless, concluding that reasonable jurists could find this Court's assessment of this constitutional claim debatable or wrong, the Court grants Petitioner a certificate of appealability on same.


II.  Sub-Claim 1 of Ground 2: Failure to Present Mitigating Evidence during the Penalty Phase

With Ground 2, the Petitioner alleges that his right to effective assistance of counsel during the penalty phase was denied, as a result of the failure of his trial

---

[9]The other decision cited by the Petitioner, White v. McAninch, 235 F.3d 988 (6th Cir. 2000), is not authoritative, given that the Sixth Circuit did not apply the AEDPA, because that litigation predated the effective date of that statute.

[10]Given that conclusion, it is not necessary to consider the question of whether the introduction of Petitioner's prison records was prejudicial, as that term is defined by Strickland.

counsel to present relevant mitigating evidence.  Sub-claim 1 of that Ground is predicated on the proposition that trial counsel failed to provide effective assistance by failing to introduce the effects on him of long-term incarceration and the prison culture in which he was raised.  See Doc. #12-3 at 4-6.  In support of this particular assertion, Petitioner points to the review of his home life and prior incarceration conducted by Clemens Bartollas, Ph.D. ("Bartollas"), a sociologist and an expert on the effects of long-term incarceration and how it affects children who are essentially raised in prison.[11]  Id.  According to Petitioner, such testimony would have been pertinent during the penalty phase of his trial, because he was removed from his mother's home and committed to child welfare agencies due to neglect, when he was 10 years old.  Id.  Except for two periods (the first approximately one month in length and the other lasting about fourteen and one-half months), he spent the remainder of his childhood and adolescence in foster care and detention facilities.  Id.  In addition, he points out that he had spent most of his adult life in prison, including the 20-year period between 1972 and 1992, when he was incarcerated for murder.  Id.  He had been released from prison for only about five years, when he was arrested for aggravated robbery, incarcerated in a county jail facility, escaped and murdered Dials.  Id.  Petitioner also asserts that testimony, such as that which could have been provided by Bartollas, was vital, because it could have prevented the prosecution from diminishing the value of his sister's testimony concerning the horrific abuses they suffered as children.  Id. at 4-5.  Petitioner points out that the prosecution had argued that the abusive

---

[11]Parenthetically, Bartollas submitted an affidavit in support of the Petitioner's request for post-conviction relief in state court and testified during the oral and evidentiary hearing conducted by Judge Merz.

conditions were not that significant as a mitigating circumstance, given that he had been removed from his mother's home at the age of 10.  Id. at 5.  According to Petitioner, Bartollas' testimony would have countered that argument, by providing evidence to the jury that the numerous detention facilities, in which he was housed during his childhood, failed to address his needs "in light of his horrific upbringing." Id.

Petitioner did not raise this particular claim during his direct appeal.  Rather, he first presented it in his state court post-conviction proceedings.  The Franklin County Court of Appeals dismissed this claim, writing:

> Generally, a defense counsel's decision as to what mitigating evidence to present during the penalty phase of a capital trial is a matter of trial strategy.  State v. Keith (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47, cert. denied, (1998), 523 U.S. 1063; [State v. Hessler, Franklin App. No. 01AP-1011, 2002-Ohio-3321].  Defense counsel has a duty to investigate mitigating circumstances in order to make informed tactical decisions about which information would be most helpful to the client's case.  State v. Jackson, Franklin App. No. 01AP-808, 2002-Ohio-3330, ¶ 84, citing State v. Johnson (1986), 24 Ohio St.3d 87, 90, 494 N.E.2d 1061.  However, out-of-record evidence that is merely cumulative of, or alternative to, other mitigation evidence defense counsel presented does not provide substantive grounds for a claim of ineffective assistance of counsel at mitigation. Hessler, supra; State v. Combs (1994), 100 Ohio App.3d 90, 98, 105, 652 N.E.2d 205.  See, also, Keith, at 536, 684 N.E.2d 47, citing Johnson, at 91, 494 N.E.2d 1061 (stating "[t]he decision to forego the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel").
>
> Further, decisions regarding what witnesses to call falls [sic] within the purview of trial strategy and, absent prejudice, generally will not constitute ineffective assistance of counsel.  Hessler, at ¶ 42.  To demonstrate prejudice, a petitioner must show not only that there was mitigating evidence counsel failed to present, but also "there is a reasonable probability that the evidence would have swayed the jury to impose a life sentence."  Keith, at 536, 684 N.E.2d 47….
>
> Although Drs. Haskins and Bartollas believe a better job could have been done presenting defendant's psychological background, they have the benefit of perfect hindsight, the distorting effect of which must be avoided.

State v. Post (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754, cert. denied, (1988), 484 U.S. 1079. "A post-conviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial." Combs, at 103, 652 N.E.2d 205. Moreover, the affidavits of Drs. Haskins and Bartollas are largely cumulative of, or alternative to, the mitigation evidence presented by defense counsel and thus do not support substantive grounds for an ineffective-assistance claim. Combs; Hessler; [State v. Murphy (Dec. 26, 2000), Franklin App. No. 00AP-23], supra.

State v. Campbell, 2003 WL 22783857 (Ohio App. 2003) at *9.

In his Report and Recommendations, Judge Merz thoroughly and exhaustively addressed this claim. See Doc. #59 at 37-47. In particular, that judicial officer extensively reviewed Bartollas' testimony, given during the oral and evidentiary hearing, attorney Mooney's hearing testimony pertaining to this issue, and Dr. Smalldon's trial testimony. Id. at 43-46. Based upon that review, Judge Merz concluded:

> [T]he prejudicial aspects of this evidence would have strongly outweighed its mitigation value. It is evident that defense counsel and the defense expert had access to the records from Campbell's adolescence time period and that this "gap" was touched upon at trial, though perhaps not in the most detailed of manners. In more detail, however, the records show that during the various placements between the ages of ten and eighteen, Petitioner was hostile and aggressive, was constantly running away from his placements, was caught stealing on multiple occasions, frequently fought with other children, and was consistently sexually victimizing other boys. It is also noted that any possible abuse in his foster homes was reported only by Petitioner himself and does not appear to be mentioned in any state records. When he was permitted to return home for a short duration, the records become replete with truancy, physical abuse toward his mother, starting fires in the home, an incident involving purse snatching, auto theft, and other "undesirable" behaviors.

Id. at 46. Thus, the Magistrate Judge recommended that this Court dismiss this particular claim of ineffective assistance of counsel, because Campbell had failed to establish the prejudice prong of Strickland. That judicial officer also recommended

that this Court hold that the failure of his trial counsel to call a mitigation expert such as Bartollas did not constitute deficient performance under Strickland.

The Petitioner has objected to this recommendation.  See Doc. #61 at 8-22. According to Campbell, Judge Merz was incorrect in concluding that he had failed to establish either prong of the Strickland test.  With respect to the prejudice prong, the Petitioner has initially reviewed the evidence concerning his various placements as a child and the testimony from Bartollas as to why those placements were inappropriate and failed to address his (Campbell's) many emotional problems, such as his potential for violence and the obstacles he faced as a biracial child.  Id. at 12-14.  Indeed, Petitioner contends that Bartollas would have testified that no treatment plans were developed for the Petitioner.  Id. at 15-16.  In addition, he has pointed out the beneficial aspects of testimony from Bartollas, such as showing that what others may have seen as bad behavior by him was in reality his cry for help; that he was not a bad person who had squandered his chances to reform by his own choice, but rather a tortured youth who never got the help he desperately needed and deserved; and that he was destined to turn into a hardened, career criminal due to the circumstances of his home life and the time he spent during his minority as a ward of the state.  Id. at 18-19.  In short, based upon his review of the records from Petitioner's detentions between the ages of 10 and 18, Bartollas concluded that the Campbell's criminal behavior as an adult, including his murdering of Dials, flowed from the failure of the state of Ohio to provide the treatment he needed during those detentions.

What the Petitioner has omitted, however, is a discussion of the prejudicial information contained in the records upon which Bartollas based his testimony.  If

he had testified during the penalty phase of Campbell's trial, that information certainly would have been introduced into evidence.  Judge Merz reviewed same in the above-quoted passage from his Report and Recommendations, and it will not be repeated here.  Doc. #59 at 46.  Moreover, during his cross-examination at the evidentiary hearing conducted by the Magistrate Judge, Bartollas indicated that the Petitioner was a cold-blooded murderer.  See Transcript of August 17, 2007, Oral and Evidentiary Hearing (Doc. #57) at 93-95.  Without deciding whether the foregoing prejudicial affects of testimony would have outweighed its beneficial aspects, this Court does conclude that Campbell has failed to demonstrate a reasonable probability (i.e., probability sufficient to undermine confidence in the outcome of the penalty phase) that, but for trial counsel's failure to present testimony from Bartollas during the penalty phase, the jury would not have imposed the death penalty, and that, therefore, he has failed to demonstrate prejudice, as that term was defined by the Court in Strickland.

Having concluded that the Petitioner has failed to establish the prejudice prong of the Strickland test,[12] this Court overrules the his Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate to sub-claim 1 of Ground 2.  However, concluding that reasonable jurists could find this Court's assessment of this constitutional claim debatable or wrong, the Court grants Petitioner a certificate of appealability on same.

_____

[12]Given that conclusion, it is not necessary for the Court to consider whether the failure to call Bartollas to testify during the penalty phase constituted deficient performance.  Were it necessary to do so, however, based upon the discussion, supra, at 20-21, this Court would conclude that the decision not to call Bartollas was not deficient performance.

III.  Sub-Sub-Claims 2.1 and 2.2 of Ground 3: Ineffective Assistance of Counsel
during the Guilt Phase

    With Ground 3 of his Petition, Campbell alleges that his trial counsel failed to
provide effective assistance during the guilt phase of his trial.  See Doc. #12-3 at
9.  In his Objections (Doc. #61), Petitioner has challenged only the Magistrate
Judge's recommendation as to sub-sub-claims 2.1 and 2.2 of that Ground.  The
Court addresses the parties' arguments concerning those two sub-sub-claims in the
above order.


A.  Sub-Sub-Claim 2.1 of Ground 3: Prior Calculation and Design

    With sub-sub-claim 2.1, Petitioner contends that his trial counsel were
ineffective, as a result of failing to defend on the basis that he did not murder Dials
with prior calculation and design.  Doc. #12-3 at 9-10.  One of the four counts of
aggravated murder with which Campbell was charged was predicated upon the
allegation that he had acted with prior calculation and design, making such an
essential element of that charged offense.  See Ohio Rev. Code § 2903.01(A)
(defining aggravated murder as purposefully causing the death of another with prior
calculation and design).  According to Petitioner, the evidence of prior calculation
and design was weak; therefore, he was denied his Sixth Amendment right to
effective assistance of counsel, as a result of trial counsel's failure to argue to the
jury that the prosecution had not proved that element.  Doc. #12-3 at 10.

    During his direct appeal, the Ohio Supreme Court rejected this claim of
ineffective assistance of counsel, writing:

        First, he contends that they should have contested the issue of prior
        calculation and design.  Although counsel did not expressly concede the

- 24 -

existence of prior calculation and design, nor did they argue that the state had failed to prove it. (They did ask for an instruction on murder as a lesser included offense, but it was refused.) Campbell contends that had counsel contested prior calculation and design, he might have been acquitted of aggravated murder on Count One.

To the contrary, however, we conclude that it would have been difficult to raise a reasonable doubt as to prior calculation and design. Campbell confessed that he "lied to" Dials when he said he would not hurt him. Moreover, he told Dials to get on the floorboard before shooting him twice in the head at close range.

But even had the suggested strategy had any chance of prevailing as to Count One, it would have done no good at all on the three felony-murder counts, for prior calculation and design was not an element of those counts. Thus, counsel's strategy was rational. Moreover, counsel discussed in advance with Campbell the strategy of not contesting guilt. Even where counsel admits his client's guilt, the client "can hardly complain that his counsel was ineffective if he freely and knowingly consented to the trial strategy." Wiley v. Sowders (C.A.6, 1982), 669 F.2d 386, 389.

In addition to showing that his counsel pursued a professionally unreasonable strategy, Campbell must show that the errors of his counsel prejudiced him. That he cannot do. Count One was merged into the felony-murder counts, and thus cannot be a source of prejudice. Prior calculation and design was not an issue as to the felony-murder counts, so the failure to contest it was not prejudicial as to them.

90 Ohio St.3d at 337-38, 738 N.E.2d at 1198.

In his Report and Recommendations, Judge Merz recommended that this Court dismiss this claim, because Campbell had failed to establish either prong of the Strickland test (i.e., deficient performance and prejudice) and, further, given that the decision of the Ohio Supreme Court resolving this claim was neither contrary to nor an unreasonable application of Strickland. Doc. #59 at 54.

In addition to arguing in his Objections that the Magistrate Judge erred in not finding that trial counsel's performance was deficient as a result of failing to pursue a prior calculation and design defense, Petitioner contends that the Magistrate Judge improperly concluded that he had failed to establish prejudice. See

Doc. #61 at 25-27.  In particular, he contends that he was prejudiced, not by his conviction for murder with prior calculation and design, but because counsel failed to harmonize the guilt phase with their mitigation strategy by recognizing that the guilt phase provided an opportunity to advocate for their client's life.  Id. at 25. According to Campbell, his trial counsel failed to reduce his moral culpability, by neglecting to argue during the guilt phase that the prosecution had failed to prove prior calculation and design.  Id.  In support of the proposition that he was prejudiced as a result of the foregoing, Petitioner relies upon United States v. Green, 343 F. Supp.2d 23 (D.Mass. 2004), vacated on grant of mandamus, United States v. Green, 407 F.3d 434 (1st Cir.), cert. denied, 546 U.S. 962 (2005). Therein, the District Court decided to seat a jury to determine the defendants' guilt and, then, if necessary, a second jury to decide what penalty to impose.  Only the second jury would be death-qualified.  In support of that decision, the District Court wrote:

> Updated data presented by defendants in this case overwhelmingly shows that death-qualified jurors are significantly more conviction prone than jurors who are not death qualified.  For example, nearly one half (49.2%) of all death-qualified capital jurors make their sentencing decision before the penalty phase of the trial even begins.  Darryl Green and Branden Morris's Supplemental Memorandum On the Issue of Impaneling Separate Juries, filed September 10, 2004, at p. 6 (citing William Bowers and Wanda Foglia, Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing, 30 Crim. Law Bulletin 51, 56 (2003)).  Several qualitative studies found that jurors who were exposed to the potential punishment during jury selection have a propensity to believe that the subtext of the voir dire is that the trial is not about whether the defendant committed the underlying crime but about what punishment the defendant should receive. Id. at 9-10 (citing Craig Haney, On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process, 8 Law & Human Behavior 121 (1984); Examining Death Qualification: Further Analysis of the Process Effect, 8 Law & Human Behavior 133 (1984); Haney, Hurado & Vega, "Modern" Death Qualification: New Data on Its Biasing Effects, 18 Law &

Human Behavior 619 (1994)).  These findings represent just a sliver of the recent data indicating that death-qualified jurors are skewed to be conviction-prone.

343 F. Supp.2d at 34-35 (emphasis added).[13]  Petitioner points to the emphasized portion in the quoted passage as establishing his premise that the guilt phase of a death penalty trial gives an attorney the opportunity to advocate for his client's life, by harmonizing his presentation during that phase with his mitigation strategy.

In ruling on the Petitioner's Objections (Doc. #61), this Court focuses exclusively on the prejudice prong of the Strickland test.  This Court accepts for present purposes that the statistics reported in Green are accurate and that, therefore, it is essential for defense counsel in a death penalty prosecution to focus on mitigation during the guilt phase.  That said, this Court cannot conclude that those statistics establish a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's allegedly unprofessional error of not contesting the element of prior calculation and design during the guilt phase, the death penalty would not have been imposed on him.[14] Therefore, this Court concludes that the Petitioner has failed to demonstrate the

---

[13]The First Circuit granted the Government's request for a writ of mandamus, because the federal death penalty act did not authorize such a procedure and a defendant could not waive the unitary jury requirement.  United States v. Green, 407 F.3d 434 (1st Cir.), cert. denied, 546 U.S. 962 (2005).

[14]It bears emphasis that, even though this asserted error occurred during the guilt phase, the Petitioner contends that it affected the penalty imposed, rather than the finding that he was guilty of the aggravated murder of Dials.

requisite prejudice as a result of the failure of his trial counsel to contest the element of prior calculation and design during the guilt phase of his trial.[15]

Accordingly, this Court overrules Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate to sub-sub-claim 2.1 of Ground 3.  In addition, concluding that reasonable jurists would not find this Court's assessment of this constitutional claim debatable or wrong, the Court denies Petitioner a certificate of appealability on same.

B.  Sub-Sub-Claim 2.2 of Ground 3: Voluntary Intoxication

With sub-sub-claim 2.2 of Ground 3, Petitioner alleges that he was denied effective assistance of trial counsel as a result of their failure to pursue voluntary intoxication as a defense.  Doc. #12-3 at 10.  Petitioner points out that he stated in his confession that he had consumed a 40-ounce beer before shooting Dials and that two additional, empty beer bottles were found in Dials' truck, while a beer bottle, which was either full or empty, was found in Katie Workman's ("Workman") car, which Petitioner had also stolen.  Id.  According to Campbell, his trial counsel did not question witnesses about those additional beer bottles or whether his breath smelled of alcohol.  Id.

_____

[15]Given that conclusion, it is not necessary to address the Petitioner's assertion that the failure of his trial counsel to contest the issue of prior calculation and design constituted deficient performance.  Were it necessary to do so, however, based upon the discussion, supra, at 25, this Court would conclude that the decision not to contest the issue of prior calculation and design was not deficient performance.

- 28 -

In State v. Foute, 2007 WL (Ohio App. 2007), the Cuyahoga County Court of Appeals elaborated upon voluntary intoxication as a defense to a crime under Ohio law:

> Fuote's additional assertion that his intoxication provided a defense also lacks merit. As the Ohio Supreme Court has held, "[t]he general rule in Ohio is that voluntary intoxication is not a defense to any crime." State v. Fox (1981), 68 Ohio St.2d 53. While State v. Wolons (1989), 44 Ohio St.3d 64, recognizes that an exception exists when specific intent is an essential element of the crime, the instant case does not support such an exception. To serve as a defense, the intoxication must be at such a level that it precludes the formation of specific intent. See State v. Mundy (1994), 99 Ohio App.3d 275.

Id. at *2. Specific intent is an essential element of the offense of aggravated murder. See e.g., State v. Taylor, 98 Ohio St.3d 27, 40, 781 N.E.2d 72, 84-85 (2002) (noting that "the overall [jury] charge clearly indicated that the burden was on the state to prove specific intent to kill and that the jury was required to find specific intent to kill before it could convict appellant of aggravated murder"), cert. denied, 538 U.S. 1062 (2003); State v. Myers, 97 Ohio St.3d 335, 356, 780 N.E.2d 186, 212 (2002) (same), cert. denied, 539 U.S. 906 (2003).

In rejecting this claim of ineffective assistance of counsel during Petitioner's direct appeal, the Ohio Supreme Court wrote:

> Campbell also contends that his counsel could have argued voluntary intoxication because Campbell drank a forty-ounce beer before shooting Dials. But voluntary intoxication negates intent only where it renders the defendant unable to form intent. State v. Fox (1981), 68 Ohio St.2d 53, 54-55, 428 N.E.2d 410, 411-412; see, also, State v. Jackson (1972), 32 Ohio St.2d 203, 206, 291 N.E.2d 432, 433, quoting Wertheimer, The Diminished Capacity Defense to Felony-Murder (1971), 23 Stanford L. Rev. 799, 805. The guilt-phase evidence leaves no room for doubt that this was an intentional killing. Moreover, Campbell never claimed in his confession that he was drunk during the crime, and nothing in the record supports his present claim that he "may have consumed more than one" bottle of beer.

The record does not show that counsel either performed deficiently or prejudiced Campbell by failing to pursue a voluntary-intoxication defense.

90 Ohio St.3d at 338, 738 N.E.2d at 1198-99.

In his Report and Recommendations, Judge Merz recommended that this Court dismiss this claim, because the decision to reject this claim by the Ohio Supreme Court was neither contrary to nor an unreasonable application of Strickland.  Doc. #59 at 54-55.  In his Objections, Petitioner disagrees with the recommendation of the Magistrate Judge.  Doc. #61 at 27.  He also contends that evidence of his intoxication developed during the guilt phase could have been considered as mitigating evidence by the jury in the penalty phase.

This Court agrees with Judge Merz that the decision of the Ohio Supreme Court, rejecting Petitioner's claim that he was denied effective assistance of counsel because his trial counsel failed to urge voluntary intoxication as a defense, was neither contrary to nor an unreasonable application of Strickland.[16]  As Judge Merz pointed out (Doc. #59 at 55), Petitioner told police during his confession that he had consumed only one 40-ounce bottle of beer.  To raise this defense, therefore, trial counsel would have been required, in effect, to call their client a liar.  Moreover, this Court cannot agree with Petitioner that further evidence of his intoxication would have assisted in the penalty phase of his trial; rather, such evidence merely would have highlighted to the jury that he had lied, which would

---

[16]The Ohio Supreme Court concluded that the Petitioner had failed to establish either prong of Strickland.  Supra, at 29-30 (quoting 90 Ohio St.3d at 338, 738 N.E.2d at 1198-99).  In concluding that the court's decision in that regard was neither contrary to nor an unreasonable application of Strickland, this Court finds that Petitioner has failed to show either that his trial counsel were deficient as a result of failing to urge intoxication as a defense during the guilt phase, or that this failure cause him to suffer prejudice.

not appear to supply that body with the basis for exercising mercy on behalf of an individual, not having previously claimed he was intoxicated at the time of the crimes, later blaming his actions on having voluntarily consumed some beer.

Accordingly, this Court overrules Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate to sub-sub-claim 2.2 of Ground 3.  In addition, concluding that reasonable jurists would not find this Court's assessment of this constitutional claim debatable or wrong, the Court denies Petitioner a certificate of appealability on same.


IV.  Ground 4: Ineffective Assistance of Counsel During Voir Dire

With Ground 4 of his Petition, Campbell alleges that he was denied effective assistance of counsel during voir dire.  Doc. #12-3 at 13-14.  This claim is comprised of two sub-claims, to wit: 1) his trial counsel was ineffective as a result of failing to move for a change of venue; and 2) his trial counsel was ineffective, because they unduly disparaged him, causing the jury to prejudge the case during voir dire.  Id.  As a means of analysis, this Court will discuss those two claims in the above order.


A.  Sub-Claim 1 of Ground 4: Change of Venue

With this sub-claim, the Petitioner alleges that he was denied effective assistance of counsel as a result of his trial counsel's failure to move for a change of venue.  Doc. #12-3 at 13.  He contends that the inordinate pre-trial publicity surrounding his escape, capture, the charges filed against him as a result, the charges pending against him at the time of his escape and his previous convictions

rendered it impossible for him to receive a fair trial in Franklin County, because a

jury drawn from that county would inevitably be influenced by that pre-trial

publicity.

The Franklin County Court of Appeals rejected this claim on the merits,

during Petitioner's post-conviction proceedings in state court, writing:

> Next, defendant asserts the trial court erred in dismissing the petition's third ground for relief, which alleges defendant was deprived of his constitutional right to the effective assistance of counsel by trial counsel's failure to move for a change of venue.  In the petition, as in this appeal, defendant argues he was prejudiced by counsel's failure to request a venue change.  Specifically, defendant contends the pervasive publicity surrounding defendant's arrest, indictment and prosecution operated to deprive defendant of his right to a fair trial by an impartial jury, which defendant contends could have been protected by a venue change.  As previously noted, in support of his ineffective assistance of counsel claim[,] defendant submitted numerous newspaper articles concerning the case that were published before trial.  Defendant contends prejudice to him should be presumed from the extensive pretrial publicity, and he therefore should be granted a new trial in a different venue.  Alternatively, defendant argues, at the very least he should be granted discovery and an evidentiary hearing on this issue, and a re-determination should be made concerning the merit of this ground for relief.
>
> > *          *          *
>
> A "[t]rial counsel's failure to request a change of venue is not tantamount to ineffective assistance of counsel."  State v. White (1998), 82 Ohio St.3d 16, 24, 693 N.E.2d 772.  When it appears a fair and impartial trial cannot be held, a trial court can change venue. Crim. R. 18(B); R.C. 2901.12(K).  However, even where there is extensive pretrial publicity, a change of venue is not automatically granted.  White, at 24, 693 N.E.2d 772.  "Instead, the decision whether to grant a change of venue rests largely within the discretion of the trial court."  Id., citing State v. Maurer (1984), 14 Ohio St.3d 239, 250.
>
> Although defendant contends prejudice must be presumed in this case because of the pervasive publicity, the Ohio Supreme Court has stated "[i]t is rare for a court to presume that a jury is prejudiced by pretrial publicity." White, at 21, 693 N.E.2d 772, citing State v. Lundgren (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304.  As the court explained, "the fact that prospective jurors have been exposed to pretrial publicity does not, in and of itself, demonstrate prejudice.  '[P]retrial publicity-even pervasive, adverse

publicity-does not inevitably lead to an unfair trial.' Nebraska Press Assn. v. Stuart (1976), 427 U.S. 539, 554." White, at 21, 693 N.E.2d 772. Accordingly, if "'the record on voir dire establishes that prospective veniremen have been exposed to pretrial publicity but affirmed they would judge the defendant solely on the law and the evidence presented at trial, it is not error to empanel such veniremen.'" Id., quoting Maurer, at 252. "'[A] careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.'" Id., quoting State v. Bayless (1976), 48 Ohio St.2d 73, 98, 357 N.E.2d 1035.

The voir dire in this case covered nine days, during which the prospective jurors were questioned extensively about the pretrial publicity and their ability to impartially reach a verdict based on the evidence presented in court. During voir dire, the court excused several jurors who it determined could not be impartial or who leaned toward the death penalty. The jurors who were empaneled indicated they could try the case fairly. Although such assurances by prospective jurors are not dispositive of the defendant's right to an impartial jury, the empaneling of the jury with the defense having used only four of six available peremptory challenges belies defendant's claim the jury could not be impartial due to the pretrial publicity. See State v. Getsy (1998), 84 Ohio St.3d 180, 189, 702 N.E.2d 866, cert. denied, (1999), 527 U.S. 1042. While it remained open for defendant to demonstrate a juror had actually formed an opinion, thereby raising the presumption of partiality, Murphy v. Florida (1975), 421 U.S. 794, 800, neither the petition nor supporting documents defendant submitted present sufficient operative facts demonstrating [that] pretrial publicity prejudiced the empaneled jury.

2003 WL 22783857 at *5-*6.

In Foley v. Parker, 488 F.3d 377 (6th Cir. 2007), the Sixth Circuit reiterated

the standards which must be applied to determine whether a criminal defendant

has a constitutional right to a change of venue:

If pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the trial court should grant the defendant a change in venue. Irvin v. Dowd, 366 U.S. 717, 722-24 (1961); Ritchie v. Rogers, 313 F.3d 948, 956 (6th Cir. 2002). Prejudice resulting from pretrial publicity can be presumptive or actual. Nevers v. Killinger, 169 F.3d 352, 362 (6th Cir. 1999), abrogated on other grounds, Harris v. Stovall, 212 F.3d 940, 942-43 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and

the surrounding community.  Ritchie, 313 F.3d at 952-53; Gall v. Parker, 231 F.3d 265, 309 (6th Cir. 2000).  Prejudice from pretrial publicity is rarely presumed. DeLisle v. Rivers, 161 F.3d 370, 382 (6th Cir. 1998).

Where pretrial publicity cannot be presumed prejudicial, the trial court must then determine whether it rises to the level of actual prejudice.  Ritchie, 313 F.3d at 962.  The primary tool for discerning actual prejudice is a searching voir dire of prospective jurors.  Id.  The court must review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant.  Nevers, 169 F.3d at 366.  Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality.  Id. at 366-67.  "[M]ere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint...."  DeLisle, 161 F.3d at 382.  The prospective juror must be able to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court.  Irvin, 366 U.S. at 723; Ritchie, 313 F.3d at 962.  The relevant question is "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."  Patton v. Yount, 467 U.S. 1025, 1036 (1984).

Id. at 387.

In his Report and Recommendations, the Magistrate Judge recommended that this Court dismiss this claim, because trial counsel were not ineffective as a result of their failure to request a change of venue.  Doc. #59 at 58-61.  In particular, Judge Merz concluded, in essence, that Petitioner did not suffer prejudice as a result of his trial counsel's failure to move for a change of venue, given that it is unlikely that such a request would have been granted.  Id. at 60-61.  Campbell bases his Objections to the recommendations of the Magistrate Judge concerning this claim, Ground 4, on his Objections to that judicial filing as it relates to Ground 5, which sets forth a related claim.  See Doc. #61 at 36-37.  In Ground 5, Campbell has alleged that he was denied the right to a fair and impartial jury by

the pretrial publicity about the offenses he committed.  In his Objections, as they relate to Ground 5, the Petitioner argues that the pretrial publicity in his prosecution was so pervasive, that prejudice must be presumed because voir dire examination did not reveal the true extent of bias.  Id. at 38.  Thus, Petitioner does not contend that the pretrial publicity rose to the level of actual prejudice.

In Irwin v. Dowd, 366 U.S. 717 (1961), the Supreme Court decided that the petitioner had been deprived a fair and impartial jury, because of pervasive pretrial publicity.  Therein, the petitioner had been charged with committing six murders, in the area of Evansville, Indiana.  Upon his arrest, the prosecutor issued a press release indicating that he had confessed to committing all six murders.  After the Vanderburgh County, Indiana,[17] Grand Jury had indicted him for the murder for which he was ultimately convicted, petitioner moved for a change of venue, which was granted, with the trial moved to Gibson County, Indiana, a rural county of 50,000, which is adjacent to Vanderburgh County.  The trial court refused petitioner's request for a further change of venue.  After being convicted of the murder and sentenced to death, the petitioner sought a writ of habeas corpus in federal court.  In ordering that a writ be granted, the Supreme Court reviewed the prejudicial pretrial publicity concerning the petitioner and his crimes:

> Here the build-up of prejudice is clear and convincing.  An examination of the then current community pattern of thought as indicated by the popular news media is singularly revealing.  For example, petitioner's first motion for a change of venue from Gibson County alleged that the awaited trial of petitioner had become the cause celebre of this small community-so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast

---

[17]Evansville is located in Vanderburgh County.

over the local stations.  A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial.  The motion further alleged that the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and that, in addition, the Evansville radio and TV stations, which likewise blanketed that county, also carried extensive newscasts covering the same incidents.  These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war.  He was accused of being a parole violator.  The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess.  Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana.  They reported petitioner's offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted).  One story dramatically relayed the promise of a sheriff to devote his life to securing petitioner's execution by the State of Kentucky, where petitioner is alleged to have committed one of the six murders, if Indiana failed to do so.  Another characterized petitioner as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors.  In many of the stories[,] petitioner was described as the 'confessed slayer of six,' a parole violator and fraudulent-check artist.  Petitioner's court-appointed counsel was quoted as having received 'much criticism over being Irvin's counsel' and it was pointed out, by way of excusing the attorney, that he would be subject to disbarment should he refuse to represent Irvin.  On the day before the trial[,] the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this case) as well as 'the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky.'

It cannot be gainsaid that the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of Gibson County.  In fact, on the second day devoted to the selection of the jury, the newspapers reported that 'strong feelings, often bitter and angry, rumbled to the surface,' and that 'the extent to which the multiple murders-three in one family-have aroused feelings throughout the area was emphasized Friday when 27 of the 35 prospective jurors questioned were excused for holding biased pretrial opinions ....'  A few

days later the feeling was described as 'a pattern of deep and bitter prejudice against the former pipe-fitter.' Spectator comments, as printed by the newspapers, were 'my mind is made up'; 'I think he is guilty'; and 'he should be hanged.'

Finally, and with remarkable understatement, the headlines reported that 'impartial jurors are hard to find.' The panel consisted of 430 persons. The court itself excused 268 of those on challenges for cause as having fixed opinions as to the guilt of petitioner; 103 were excused because of conscientious objection to the imposition of the death penalty; 20, the maximum allowed, were peremptorily challenged by petitioner and 10 by the State; 12 persons and two alternates were selected as jurors and the rest were excused on personal grounds, e.g., deafness, doctor's orders, etc. An examination of the 2,783-page voir dire record shows that 370 prospective jurors or almost 90% of those examined on the point (10 members of the panel were never asked whether or not they had any opinion) entertained some opinion as to guilt-ranging in intensity from mere suspicion to absolute certainty. A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on a jury.

Id. at 725-27.

Herein, a review of the newspaper articles submitted by the Petitioner and the portions of voir cited in support of this claim causes this Court to conclude that he was not presumptively prejudiced by the pretrial publicity in his prosecution. Irwin, supra, is the leading decision by the United States Supreme Court, holding that a criminal defendant had been denied the right to a fair and impartial jury as a result of pervasive pretrial publicity, even in the absence of actual prejudice. Since the pretrial publicity to which Campbell was subjected pales in comparison to that which affected the jury in that Supreme Court decision, this Court concludes that the facts giving rise to Irwin are not analogous to those upon which Petitioner bases his claim concerning the failure of his trial counsel to move for a change of venue and that, therefore, prejudice cannot be presumed. Indeed, the facts and circumstances herein are similar to those giving rise to Patton v. Yount, 467 U.S.

1025 (1984), wherein the Supreme Court concluded that prejudice could not be presumed.  In <u>Patton</u>, the petitioner, a high school teacher, murdered a female student, but his conviction was reversed by the Pennsylvania Supreme Court.  The re-trial started four years later, in the same county and with substantial newspaper coverage, which included the fact that the defendant's confession introduced to obtain his conviction in the first trial had been ruled inadmissible by the Pennsylvania Supreme Court.  After he was convicted a second time, the Third Circuit concluded that he was entitled to a writ of habeas corpus, because of the pretrial publicity.  The Supreme Court reversed, concluding that "the voir dire testimony and the record of publicity do not reveal the kind of 'wave of public passion' that would have made a fair trial unlikely by the jury that was empaneled as a whole."  <u>Id</u>. at 1040.  Similarly, there was not a "wave of public passion" before Petitioner went on trial in Franklin County.  Accordingly, this Court concludes that it cannot presume prejudice as a result of the pretrial publicity. Moreover, since the Petitioner has not established actual prejudice, the Court concurs with the Magistrate Judge that the failure to move for a change of venue was not ineffective assistance of counsel, since it would not have been granted in the absence of presumed or actual prejudice.  Therefore, the Petitioner has failed to establish the prejudice prong of <u>Strickland</u>.

Based upon the foregoing, this Court overrules Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate to sub-claim 1 of Ground 4.  However, concluding that reasonable jurists could find this Court's assessment of this constitutional claim

debatable or wrong, the Court grants Petitioner a certificate of appealability on same.

## B.  Sub-Claim 2 of Ground 4: Undue Disparagement of Petitioner by Counsel

With this sub-claim, the Petitioner alleges that he was denied effective assistance of counsel as a result of unduly disparaging comments his trial counsel made about him during voir dire.  See Doc. #12-3 at 13-14.  In particular, the Petitioner argues that his counsel repeatedly informed the jury of the basic facts concerning the crimes for which he was on trial and of his previous murder, "by identifying certain information as fact or through transparent hypotheticals."  Id. at 13.  In addition, he contends the choice of words used by his trial counsel to describe the crime with which he was charged, such as "horrendous," "gruesome" and "senseless," disparaged him.  Id. at 14.

During his direct appeal, the Ohio Supreme Court rejected this claim, writing:

Campbell accuses his counsel of "disparaging" him by placing "undue emphasis on the aggravated murder" at voir dire and describing it in such terms as "terrible," "horrendous," "gruesome," "senseless." However, it is difficult to discuss this crime without using such words. Even Campbell's present counsel, in their brief, call it "infamous," "sordid," and "horrible." Campbell's counsel may have sought to impress the jury with their candor, hardly an unreasonable tactic.

The defense strategy throughout was to offer no defense and concentrate on saving Campbell's life.  A number of Campbell's complaints about counsel's performance stem from this strategy.  Thus, its rationality must be evaluated.

"Concessions of guilt, in any form, are among the most troublesome actions a defense counsel can [t]ake * * *."  State v. Goodwin (1999), 84 Ohio St.3d 331, 336, 703 N.E.2d 1251, 1258.  Nevertheless, such concessions are not per se ineffective but must be analyzed under Strickland for deficiency and prejudice.  See Goodwin at 336-339, 703 N.E.2d at 1258-1260.

Campbell's guilt was clear.  He confessed at length; defense counsel tried to suppress that confession, but failed.  Corroborating evidence sealed his guilt.  Dials was shot with the same gun Campbell had stolen from Harrison less than three hours before.  Campbell's palm print was found in Dials's truck.  Campbell told Katie Workman that he had "just killed one man."

Campbell's counsel stated that he had discussed the trial strategy with Campbell, and that Campbell would have pleaded guilty had the law allowed him to try the penalty phase to a jury after such a plea.  Since Campbell had to undergo a jury trial on guilt to get one on penalty, counsel tried "to maintain … credibility with this jury" by "let[ting] them know that we're not contesting the charges."  In closing argument, counsel emphasized that Campbell "accepts responsibility for what he did."

*     *     *

Campbell contends that counsel's voir dire statements prejudged his guilt.  Yet the statements were consistent with counsel's strategy of conceding guilt and trying to save Campbell's life, and were not prejudicial.

90 Ohio St.3d at 337-38, 738 N.E.2d at 1198-99.

In his Report and Recommendations, Judge Merz recommended that this Court dismiss this claim on the merits, because Petitioner had failed to establish either prong of the Strickland test.  Doc. #59 at 61-64.  In his Objections, the Petitioner argues that the Magistrate Judge erred in recommending that he had failed to establish the deficient performance and prejudice prongs of the two-part test adopted in Strickland.  Doc. #32 at 32-36.

Based upon the reasoning of the Magistrate Judge, as well as upon the observation that the rejection of this claim by the Ohio Supreme Court was neither contrary to nor an unreasonable application of federal law clearly established by the United States Supreme Court, this Court concludes that the Petitioner is not entitled to relief with sub-claim 2 of Ground 4 of his Petition.

Accordingly, this Court overrules Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate

to sub-claim 2 of Ground 4.  In addition, concluding that reasonable jurists would not find this Court's assessment of this constitutional claim debatable or wrong, the Court denies Petitioner a certificate of appealability on same.

V.  Ground 5: Change of Venue

In Ground 5, the Petitioner alleges that he was denied his constitutional right to a fair and impartial jury, because the trial court did not order a change of venue. See Doc. #12-3 at 15-17.  In support of this claim, Petitioner alleges that his crime was "probably the most heavily publicized and infamous in Franklin County's history," although he has not cited anything to substantiate that assertion.  Id. at 15.  In addition, Petitioner points out that most prospective jurors were aware of the allegations against him.  Id.  Some prospective jurors had been exposed to the case through newspapers, others through television and others learned of it as a result of discussions with neighbors, co-workers and relatives.  Id. at 15-16. Petitioner also cites instances where prospective jurors indicated that they had heard through the media about his prior record and the facts of the case (i.e., his escape, assault of the deputy sheriff and carjacking, kidnaping and murder of Dials).

The Ohio Supreme Court declined to address the merits of this claim, concluding that Campbell had waived it by failing to request that the trial court change venue, writing:

> In his fifth proposition, Campbell contends that pretrial publicity so pervaded the community that a fair trial was impossible; therefore, the trial court should have ordered a change of venue sua sponte.  However, Campbell waived this issue by failing to request a change of venue.  State v.

Chandler (1984), 19 Ohio App.3d 109, 112, 483 N.E.2d 192, 196.  See, generally, State v. Williams [(1977),] 51 Ohio St.2d 112, 364 N.E.2d 1364.

90 Ohio St.3d at 336, 738 N.E.2d at 1197.  During the post-conviction proceedings in state court, the Hamilton County Court of Appeals concluded that, as a result of the decision of the Ohio Supreme Court, principles of res judicata barred it from reexamining the issue.  2003 WL 22783857 at *4.  In reaching that conclusion, the appellate court rejected the Petitioner's assertion that the Ohio Supreme Court had merely declined to address this claim, because the evidentiary support for same (newspaper articles) was not part of the record, writing:

> Contrary to defendant's assertion, the Supreme Court's statements, that on direct appeal it would not and could not consider newspaper stories concerning the crime because they were not part of the trial court record, are contained in the court's discussion of defendant's separate but related claim of ineffective assistance of counsel based upon counsel's failure to move for a change of venue.  See Campbell I, at 336-337, 738 N.E.2d 1178.  No similar statements are included in the Supreme Court's discussion of defendant's separate "change of venue" issue raised on direct appeal.  See id. at 336, 738 N.E.2d 1178.  The "change of venue" issue raised on direct appeal is identical to the issue raised in the post-conviction petition's second ground for relief.  The Supreme Court disposed of the "change of venue" issue on direct appeal as follows:
>
>> In his fifth proposition, Campbell contends that pretrial publicity so pervaded the community that a fair trial was impossible; therefore, the trial court should have ordered a change of venue sua sponte.  However, Campbell waived this issue by failing to request a change of venue.
>
> (Citations omitted).  Campbell I, at 336, 738 N.E.2d 1178.
>
>       *            *            *
>
> Accordingly, the post-conviction petition's second ground for relief is barred by res judicata because (1) the issue could have been raised before trial and the supporting evidence defendant presented was in existence at the time of trial, (2) defendant raised the same issue in his direct appeal to the Ohio Supreme Court[.]  [I]n Campbell I, at 336, 738 N.E.2d 1178, the Supreme Court held that defendant is barred by waiver from asserting error on this basis.  Id.  The trial court did not err in holding that res judicata bars the post-conviction petition's second ground for relief.

Id. at 4-5.

In addition to concluding that the Petitioner could not prevail on the merits of this claim (Doc. #59 at 67-68), Judge Merz held that he had procedurally defaulted same.  Id. at 64-67.  The Petitioner has objected to the Magistrate Judge's recommendation that this Court hold that Ground 5 has been procedurally defaulted.  Soc. #61 at 42-45.  In particular, the Petitioner focuses upon the holding of the Hamilton County Court of Appeals in his post-conviction proceeding, arguing that res judicata was not an adequate and independent state ground enforced against the Petitioner, because the evidence upon which this claim rested was outside the record.  This Court cannot agree with Petitioner that the absence of evidence from the record of pretrial newspaper articles means that he has not procedurally defaulted this claim.

In support of this argument, Petitioner relies upon Hill v. Mitchell, 400 F.3d 308 (6th Cir.), cert. denied, 546 U.S. 1039 (2005).  Therein, the Sixth Circuit concluded that the state appellate court, which had ruled upon Hill's application for post-conviction relief, had erroneously concluded that res judicata barred his claim of ineffective assistance of counsel, predicated on the failure of counsel to provide civilian clothing for him for his trial, because that claim was dependent upon evidence outside the record, and that, therefore, the claim had not been procedurally defaulted.  Id. at 320.  It must be emphasized that the Sixth Circuit merely concluded that a claim of ineffective assistance of counsel, predicated on counsel's failure to provide civilian clothes for the trial, was not procedurally defaulted; that court did not suggest that, merely because a due process claim was dependent upon evidence outside the record, procedural default is never

- 43 -

implicated.[18]  If the Sixth Circuit had so held, Petitioner could have forced this Court to decide the issue of whether his confession was involuntary, simply by not raising that issue in state court, since that issue could not have been resolved without examining evidence outside the record.  Most decidedly, the Sixth Circuit did not therein purport to make such a sea-change in habeas corpus jurisprudence. Therefore, because the Hamilton County Court of Appeals concluded that Ground 5 was barred by res judicata, an adequate and independent state ground enforced against him, this Court rejects the Petitioner's challenge to the recommendation of the Magistrate Judge that this Ground is procedurally defaulted.[19]

Accordingly, this Court overrules Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate to Ground 5.[20]  In addition, concluding that reasonable jurists would neither find this Court's assessment of this constitutional claim debatable or wrong, nor debatable whether this Court was correct in its procedural ruling, the Court denies Petitioner a certificate of appealability on same.

---

[18]See Estelle v. Williams, 425 U.S. 501 (1976) (holding that compelling a prisoner to wear prison clothing during a jury trial constitutes a deprivation of due process).

[19]Petitioner also argues that, if this Court should conclude that this claim has been procedurally defaulted, he can establish cause and prejudice, which would excuse that default.  According to Campbell, such cause and prejudice is the ineffective assistance of his trial counsel, flowing from their failure to move for a change of venue.  Since this Court has concluded that counsel's failure in that regard did not constitute ineffective assistance, such failure cannot establish cause and prejudice.

[20]Given that this Court concludes that the Petitioner is barred by procedural default from raising this claim, it is not necessary to address the parties' arguments concerning its merits.

VI.  Ground 6: Preclusion of Voluntary Intoxication as Mitigation Evidence Only

With Ground 6 of his Petition, Campbell alleges that he was denied a fair

sentencing proceeding, because the trial court prevented him from pursuing and

presenting relevant evidence of mitigation.  Doc. #12-3 at 18.  In his Objections,

the Petitioner limits this claim to his assertion that the trial court prevented him

from introducing evidence of voluntary intoxication at the penalty phase, not that

the trial judge erred by not instructing on intoxication as a mitigating factor.

Doc. #61 at 48.  In his Petition, Campbell explained this aspect of Ground 6:

> The trial court also effectively precluded Petitioner from presenting
> evidence of voluntary intoxication during the mitigation phase.  At the
> motion hearing, prior to the sentencing phase, trial counsel requested that
> the trial court instruct on alcohol and/or drug impairment as a mitigating
> factor.  Here, the trial court rejected wholesale the possibility that Petitioner
> was intoxicated at the time of the offense.

Doc. #12-3 at 18.

During Petitioner's direct appeal, the Ohio Supreme Court defined his third

proposition of law, raising this very issue, as follows:

> In his third proposition of law, Campbell contends that the trial judge
> precluded him from presenting evidence of two mitigating factors: (1)
> shortened life expectancy due to physical illness and (2) voluntary
> intoxication.

90 Ohio St.3d at 327, 738 N.E.2d at 1190.  The court rejected that claim, writing:

> Campbell asked the trial court to instruct the jury in the penalty phase
> that voluntary intoxication is a potential mitigating factor.  See State v.
> Sowell (1988), 39 Ohio St.3d 322, 325, 530 N.E.2d 1294, 1300.  The
> judge refused because he did not find sufficient evidence of voluntary
> intoxication to raise a jury issue.
> We disagree with the trial judge's reasoning.  There was evidence that
> Campbell drank forty ounces of beer during the offense.  Whether or not he
> was intoxicated according to any particular definition is beside the point.
> The fact that he had a substantial amount of alcohol in his system was a

circumstance of the offense and was relevant to mitigation under both
Lockett [v. Ohio, 438 U.S. 586 (1978)] and R.C. 2929.04(B).

However, a trial court is not required to instruct on specific
nonstatutory mitigating factors.  See, e.g., State v. Goff (1998), 82 Ohio
St.3d 123, 130-131, 694 N.E.2d 916, 922-923; State v. Landrum (1990),
53 Ohio St.3d 107, 122, 559 N.E.2d 710, 727-728.  Certainly nothing in
the penalty-phase instructions precluded the jury from considering
appellant's alcohol consumption.  In fact, the trial court instructed the jury to
consider, without limitation, "any other factors that are relevant to the issue
of whether the offender should be sentenced to death" as mitigating factors.
We have held repeatedly that such an instruction is sufficient to allow the
jury to consider all the mitigating evidence before it.  Goff, supra; Landrum,
supra; State v. Scott (1986), 26 Ohio St.3d 92, 102, 497 N.E.2d 55, 64.
Thus, the trial judge was correct in refusing to instruct specifically on
voluntary intoxication, even though "erroneous reasons were assigned as the
basis" for that refusal.  Agricultural Ins. Co. v. Constantine (1944), 144
Ohio St. 275, 284, 58 N.E.2d 658, 663.

90 Ohio St.3d at 329, 738 N.E.2d at 1192.

In his Report and Recommendations, the Magistrate Judge recommended

that this Court deny this claim on the merits, because the decision of the Ohio

Supreme Court was neither contrary to nor an unreasonable application of federal

law.  Doc. #59 at 73-76.  In his Objections, Petitioner points out that the

Magistrate Judge focused upon the issue of whether Lockett v. Ohio, 438 U.S.

586 (1978) and his (Petitioner's) rights under the Eighth Amendment were violated

as a result of the lack of an instruction on the voluntary intoxication as a mitigating

factor.  Doc. #60 at 50.  To the contrary, Petitioner concedes that "the trial court

did not have to instruct on intoxication as a mitigating factor" and that "he has not

argued that the trial court's instructions barred the jury from considering evidence

of voluntary intoxication as mitigating evidence."  Id.  Rather, Petitioner contends

that he "has argued [that] the trial court's incorrect and improper finding that he

was not intoxicated prevented him from presenting intoxication as a mitigating

factor." Id.  To support this argument, Petitioner relies on the following exchange

between the trial court and counsel concerning voluntary intoxication as a

mitigating factor:

> Court: Motion to include alcohol and/or drug impairment.  Again,
> that's an instruction.
>
> And let me just say this: I probably would overrule that simply
> because in my mind and view of the evidence, I'll listen to you, but there
> was no alcohol or drug impairment.  He had a 40 ounce.
>
> I've viewed the tape [of Petitioner's confession].  I think he was
> perfectly sober, and certainly there has to be some evidence that he was
> impaired before I would even consider that and I don't see it, and so I
> probably wouldn't, probably wouldn't allow it in the instructions and
> wouldn't allow you to argue it because it just ain't there.
>
> Prosecutor: I think the evidence, your Honor, is just the contrary and
> that's from Detective Jester who testified the [Petitioner] was not impaired,
> not under the influence.
>
> Defense Counsel: Well, we haven't heard from our psychologist yet
> so—
>
> Court: All right.  Maybe that may differ, but all I've [got] right now is
> he had one 40 ounce in three hours, and that's all I know.
>
> I watched him talk for an hour and a half myself; and, of course, I
> listened to the detective.
>
> So there has to be something stronger than that for me to allow you
> to argue that as a mitigating factor, but I'll certainly listen to Smalldon—Dr.
> Smalldon.

18 Tr. Trans. at 15-16 (emphasis added).[21]  According to the Petitioner, preventing

his counsel from arguing that voluntary intoxication was a mitigating factor

constituted a violation of the principles adopted in Lockett, because it prevented

the jury from considering the mitigating effect of such evidence during the penalty

phase.  Doc. #61 at 50-51.

―――――――――――――――――

[21]A review of the closing argument presented by Campbell's counsel during the
penalty phase of the trial reveals that voluntary intoxication was not mentioned as
a mitigating factor.  See 21 Tr. Trans. at 886-917.

As an initial matter, the Respondent argues that this Court should not address the Petitioner's argument in this regard, because he only raised in his Petition the question of the <u>trial court's failure to instruct the jury on voluntary intoxication as a mitigating factor</u>, rather than alleging therein that the trial court had violated the principles established in <u>Lockett</u> by refusing to permit the Petitioner's trial counsel to argue that evidence of same was a mitigating factor. Doc. #64 at 23.  Although Campbell did not expressly state in his Petition that Ground 6 was predicated upon the premise that the trial court violated the Eighth Amendment by refusing to allow his counsel to argue voluntary intoxication as a mitigating factor, this Court nevertheless concludes that he has not waived that argument.  In support of that assertion, the Respondent relies upon <u>Tyler v. Mitchell</u>, 416 F.3d 500 (6th Cir. 2004), <u>cert</u>. <u>denied</u>, 547 U.S. 1074 (2006). Therein, the Sixth Circuit held that the petitioner had waived his contention that the state failed to prove beyond a reasonable doubt that any of the aggravating circumstances found by the jury outweighed the mitigating factors, since that argument had not been raised until the petitioner filed his traverse.  <u>Id</u>. at 504.  In his petition, Tyler had merely challenged the sufficiency of the evidence during the <u>guilt</u> phase, rather than the <u>penalty</u> phase.  <u>Id</u>.  Herein, in contrast, the Petitioner would have more clearly presented this argument if he had substituted the word "arguing" for "presenting" in the first sentence of his description of this claim, so that it would have read "[t]he trial court also effectively precluded Petitioner from arguing evidence of voluntary intoxication during the mitigation phase."  That shortcoming does not cause this Court to conclude that Petitioner waived this claim, given the broad meaning of the word "present."  Moreover, it bears

emphasis that the Court has quoted above the entirety of the discussion of voluntary intoxication as a mitigating factor during Campbell's trial.  That discussion covers about one and one-quarter pages of the more than 3000 pages in the trial transcript.  It is simply not possible to review the quoted passage without concluding that the trial court prevented Petitioner's counsel from presenting this mitigating factor to the jury, by precluding argument that his intoxicated state at the time he murdered Dials constituted a matter in mitigation for the jury to consider.  Accordingly, this Court turns to the merits of this claim.[22]

In Lockett v. Ohio, 438 U.S. 586 (1978), the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  Id. at 604.  See also, Davis v. Coyle, 475 F.3d 761, 771 (6th Cir. 2007) (holding that the state, three-judge panel violated Lockett and petitioner's rights under the Eighth Amendment by preventing him from presenting evidence during second sentencing hearing that he had adjusted to death row in the five years between the first and second sentencing proceedings).  Thus, this Court must decide whether the decision of the trial court to prevent Petitioner's counsel from arguing that voluntary intoxication is a mitigating factor precluded consideration of that mitigating factor by the jury.  For reasons which follow, this Court concludes that

---

[22]Because this Court believes the Ohio Supreme Court, likewise, construed the word "present" too narrowly, and, thus, did not consider this claim as it is now framed, this Court rejects Respondent's contention that the Petitioner has waived or procedurally defaulted this claim by failing to present it (as properly defined) to the highest state court.

the decision of the trial court in that regard did in fact preclude the jury (the sentencer) from considering an aspect of the circumstances of the offense and, thus, violated <u>Lockett</u>.[23]

Although research could not find cases which have addressed the question of whether the Eighth Amendment, as interpreted in <u>Lockett</u>, is violated when a court prevents a death penalty defendant from arguing that certain evidence in the record should be considered as mitigating, this Court concludes that it is appropriate to apply the standard for determining whether the court's instructions in a given case permit the jury to consider all mitigating evidence.  In <u>Boyde v. California</u>, 494 U.S. 370 (1990), the Supreme Court held that to resolve that question a court must decide "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  <u>Id</u>. at 380.  Herein, the Court must adapt that standard to this litigation, because the Petitioner is challenging the trial court's decision to prevent his counsel from arguing what is a mitigating factor, rather than jury instructions on that topic.  Thus, the question becomes whether there is a reasonable likelihood that the trial court's decision in that regard prevented the jury

_____

[23]The Petitioner also argues that the trial court improperly found that he was not intoxicated.  The Ohio Supreme Court concluded that, regardless of whether he was intoxicated in accordance with any particular definition of the term, the fact that he had a substantial amount of alcohol in his system was a relevant mitigating circumstance.  90 Ohio St.3d at 329, 738 N.E.2d at 1192.  Therefore, it is not necessary to address the Petitioner's argument in that regard.  If it were necessary, however, this Court would agree with the Petitioner, given that the trial court based its determination that Campbell was not intoxicated on a mistaken reading of his confession.  Campbell stated in his confession that he had consumed a 40-ounce bottle of beer three hours prior to the confession (<u>see</u> 16 Tr. Trans at Ex. 24E, pp 9-10), not that he had consumed that amount of beer over a three-hour period, as the trial court indicated.

from considering the constitutionally relevant mitigating evidence of his voluntary intoxication.  In this Court's opinion, it is not apparent that a jury would realize, on its own, without the trial court so instructing and without argument from counsel, that it should consider that the defendant had gotten voluntarily intoxicated before murdering someone, when deciding whether to impose the death penalty.  During Petitioner's appeal after remand, the Ohio Supreme Court noted that voluntary intoxication is a mitigating factor (albeit a weak such), writing:

> The nature and circumstances of the offense have little mitigating value. Campbell emphasizes that he drank at least forty ounces of beer during the crime.  Although voluntary intoxication is a mitigating factor, see State v. Sowell (1988), 39 Ohio St.3d 322, 325-326, 530 N.E.2d 1294, it is a weak one.  See State v. Otte (1996), 74 Ohio St.3d 555, 568, 660 N.E.2d 711.

State v. Campbell, 95 Ohio St.3d 48, 51, 765 N.E.2d 334, 339 (2002). Therefore, this Court concludes that there is a reasonable likelihood that the jury was prevented from considering the Petitioner's voluntary intoxication by the decision of the trial court to prevent his counsel from arguing that mitigating factor to the jury, even though that court was not obligated to tell the jury in its instructions that voluntary intoxication is a mitigating factor.

Accordingly, this Court sustains Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate to Ground 6, as defined and limited by the Petitioner in his Objections.  This Court will not, at this point, however, grant the Petitioner a conditional writ on this Ground.  Rather, the Court remands this matter to the Magistrate Judge to consider and to issue a report and recommendations on the question of whether the trial judge's decision to prevent Campbell's counsel from arguing voluntary

intoxication as a mitigating factor constituted prejudicial or harmless error, after having given the parties opportunity to brief the question.[24]  Given the seeming weakness of voluntary intoxication as a mitigating factor, one could question whether the trial court's decision to prevent argument on that topic "had substantial and injurious effect or influence in determining the jury's verdict," particularly in the absence of the Petitioner having claimed, in his confession, intoxication at the time of the crimes.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (setting forth the harmless error standard to be applied in cases on collateral review).

VII.  Ground 11: Involuntary Confession

With this Ground, Campbell alleges in his Petition that he was denied his Fifth Amendment right against self-incrimination, when law enforcement officers coerced a confession from him.  Doc. #12-3 at 37-39.  In particular, Petitioner contends that his confession was not voluntary, given that he had waived his right to remain silent because he feared for his life and hoped to gain protection through his cooperation.  Id. at 37.  Petitioner has also set forth the evidence of alleged mistreatment and threats of mistreatment upon which he bases this claim.  Id. at 37-39.

During his direct appeal, the Ohio Supreme Court rejected this claim on the merits, writing:

---

[24]The Magistrate Judge is, of course, authorized to recommend how this Court should resolve all issues that are raised in connection with any harmless error analysis.

In his fourth proposition of law, Campbell claims that his confession was involuntary, primarily because police abused him during his arrest. The trial court heard his motion to suppress the confession and denied it; Campbell contends that the denial was erroneous.

"In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances .... "  State v. Edwards (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus.  However, "'police overreaching' is a prerequisite to a finding of involuntariness.  Evidence of use by the interrogators of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality-of-the-circumstances analysis." State v. Clark (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854, quoting Colorado v. Connelly (1986), 479 U.S. 157, 163.

The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."  Edwards, supra, 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus.

In his confession, Campbell told detectives that when he was arrested, a police officer sprayed Mace into his face, even though Campbell was helpless and making no attempt to resist.  According to Campbell, the same officer told him, "When you go back to the Workhouse, you're dead." Moreover, Campbell told the detectives, another officer struck him three times in the head as he was being transported to jail, then said, "If I wasn't getting out of this van going back to my car I'd whip your a** in this van, what could you do about it?"

During interrogation[,] detectives tried to allay Campbell's fears by pointing out that police brutality is investigated by the internal affairs bureau, that there are cameras in jails, and that officers "can't do the sort of things that was done back 25 years ago."  They promised to keep him as safe as they could and pointed out that "it looks bad for us" to have prisoners beaten.

During the suppression hearing, Campbell introduced no evidence to corroborate his videotaped accusations of police misconduct.

The trial court made no express finding as to whether Campbell told the truth about being mistreated during his arrest.  However, the court did find that all of the Edwards factors were in the state's favor, specifically including [the question of whether Campbell was subjected to] "physical deprivation or mistreatment."  Moreover, the trial court found that Campbell "was more than willing" to confess, and that no pressure was put on him to do so.  We think it evident that the trial judge simply did not believe Campbell's assertions and did not believe any physical deprivation or mistreatment occurred.

Credibility determinations are made by the trier of fact, as much in a suppression hearing as in the trial itself.  State v. Fanning (1982), 1 Ohio St.3d 19, 20, 437 N.E.2d 583, 584.  Nothing in the record provides any basis for overruling the trial judge's credibility determination here.  Nothing corroborates Campbell's claim of mistreatment.

*                              *                              *

The court further found that Campbell "was aware of his Miranda Rights" and that the interrogation was "moderate" in length and intensity and "friendly" and "congenial" in tone.  Moreover, the trial court found that "there were no threats or inducements whatsoever to the Defendant to make his statements."

The record supports the trial court's findings and compels the conclusion that police used no coercive tactics to obtain Campbell's confession.  Campbell's fourth proposition is therefore overruled.

90 Ohio St.3d at 332-34, 738 N.E.2d at 1194-95.

In his Report and Recommendations, Judge Merz recommended that this Court dismiss this claim, because an application of the prevailing legal standard to the evidence presented in state court revealed that the decision of the Ohio Supreme Court was neither contrary to nor an unreasonable application of established Supreme Court precedent.  See Doc. #59 at 103-05.  In his Objections, Petitioner argues that the Magistrate Judge erred in rejecting his assertion that he confessed solely in order to avoid mistreatment, which would include threats, from the officers who had arrested him and transported him to the jail.  Doc. #61 at 53-56.  The Petitioner also argues that the decision of the Ohio Supreme Court was predicated upon unreasonable fact finding, because it acknowledged that the trial court had not made an express finding as to his credibility or lack thereof.  Id. at 56-57.  In addition, he contends that Judge Merz ignored certain essential facts in concluding that his (Campbell's) confession was voluntary.  Id. at 57-58.  For reasons which follow, this Court agrees with the Magistrate Judge that the decision of the Ohio Supreme Court that the Petitioner's confession was voluntary

is neither contrary to nor an unreasonable application of United States Supreme Court authority.

The Ohio Supreme Court rejected this claim, in part, because it concluded that the trial court had determined that the statements made by the Petitioner during his confession, concerning the alleged coercive impact of the officers who had arrested and transported him (i.e., their alleged threats and mistreatment of him), were not credible.[25]  As is explained below, if the credibility assessment by the Ohio Supreme Court is accepted, then this claim is unquestionably without merit.  Consequently, the Petitioner's credibility is central to the resolution of this claim, requiring that this Court initially decide what standard of review to apply in resolving this claim and the question of Petitioner's credibility, to wit: either that which is utilized for mixed questions of law and fact (§ 2254(d)(1)), or that applied to factual issues (§ 2254(e)(1)).

In Townsend v. Sain, 372 U.S. 293 (1963), the Court explained that the term issues of fact meant the "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators...."  Id. at 309 n. 6.  However, the determination of whether a confession was voluntary is a mixed question of law and fact and is not subject to the presumption of correctness under § 2254(e)(1).  Miller v. Fenton, 474 U.S. 104, 116 (1985).  Therefore, to resolve whether the Petitioner's confession was voluntary, this Court must apply § 2254(d)(1), and decide whether the resolution of this claim by the Ohio Supreme Court was contrary to or an unreasonable application of federal, constitutional

---

[25]It bears emphasis that the Petitioner has neither argued nor presented evidence that the officers who interrogated him engaged in coercive behavior.

principles as determined by the United States Supreme Court.  Trice v. Ward, 196

F.3d 1151, 1169 (10th Cir. 1999), cert. denied, 531 U.S. 835 (2000).  Of course,

any basic factual determinations made by the state court are subject to the

presumption of correctness under § 2254(e)(1), including credibility

determinations.  Id.; Coombs v. State of Maine, 202 F.3d 14, 18 (1st Cir. 2000).

See also, Marshall v. Lonberger, 459 U .S. 422, 433-344 (1983) (holding that

federal habeas courts are without a license to redetermine the credibility of

witnesses and that the failure of the state trial court to make an express credibility

determination is tantamount to a direct finding against the petitioner, when a

favorable credibility determination would have resulted in the petitioner prevailing

on his claim).  Accordingly, this Court concludes that the resolution of the

Petitioner's credibility by the Ohio Supreme Court is a question of fact, to be

assessed by this Court under the standards applicable to factual findings by state

courts.

    Section 2254(e)(1) sets forth the standards to be applied by a federal court

when assessing factual determinations made by state courts:

> In a proceeding instituted by an application for a writ of habeas corpus
> by a person in custody pursuant to the judgment of a State court, a
> determination of a factual issue made by a State court shall be presumed to
> be correct. The applicant shall have the burden of rebutting the presumption
> of correctness by clear and convincing evidence.

Herein, this Court concludes that the Petitioner has failed to rebut with clear and

convincing evidence the presumption that the Ohio Supreme Court had resolved

the issue of credibility against him.

    As an initial matter, this Court does not agree with the Petitioner that the

determination of his credibility by the Ohio Supreme Court was unreasonable, given

that the trial court had not made an express finding as to his credibility.  The reasoning of the Ohio Supreme Court, that the trial court implicitly rejected the Petitioner's statements concerning the mistreatment and threats he had experienced and, therefore, disbelieved those statements, is perfectly logical.  One would have expected, had the trial court concluded that Petitioner's confession was involuntary, that the court would have found that the Petitioner had been mistreated before he confessed.  The trial court's finding the confession to have been voluntary, carries the implicit finding that Petitioner's statements of mistreatment and threats of mistreatment were not credible.  Moreover, in <u>Sowell v. Bradshaw</u>, 372 F.3d 821 (6th Cir. 2004), <u>cert</u>. <u>denied</u>, 544 U.S. 925 (2005), the Sixth Circuit held that the presumption of correctness is applicable "to implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  <u>Id</u>. at 828 (internal quotation marks and citation omitted).

Campbell has cited only his statements during his confession to support his claim that he was mistreated and threatened.  Above, this Court has concluded that the Petitioner has not rebutted, by clear and convincing evidence, the determination by the Ohio Supreme Court that the trial court had resolved the issue of credibility against him.  Therefore, the statements he made during his confession, concerning mistreatment and threats, cannot support his claim that the confession was involuntary.

However, he has also pointed to the instances during his confession where he stated that he feared for his life, if he were returned to the workhouse.  Although the Ohio Supreme Court did not implicitly find that those statements

lacked credibility, they do not cause this Court to conclude that the Ohio Supreme Court's finding that Campbell's confession was not involuntary is contrary to or an unreasonable application of United States Supreme Court authority.  After initially meeting the two officers who would interrogate him,[26] he asked for two things, a couple of cigarettes and that he not be required to return to the workhouse.[27]  16 Tr. Trans. at Ex. 24E, p. 1.[28]  He explained that he was apprehensive about returning to the workhouse, given that he had assaulted a deputy sheriff, and that his 25 years in prison led him to believe that he "might end up dead."  Id.  In Hills v. Anderson, 300 F.3d 679 (6th Cir. 2002), the Sixth Circuit reiterated that "[a] confession is involuntary only if there is (1) police coercion or overreaching which (2) overbore the accused's will and (3) caused the confession."  Id. at 682 (citing Colorado v. Connelly, 479 U.S. 157, 164 (1986)).  See also, Clark v. Mitchell, 425 F.3d 270, 283 (6th Cir. 2005) (citing Connelly and noting that "police overreaching is necessary for a confession to be found invalid under the Due Process Clause of the Fourteenth Amendment").  Herein, excluding the Petitioner's statements of threats and mistreatment made during his confession, there is simply no evidence that any officer engaged in coercion or overreaching.  Accordingly, this Court concludes that Petitioner's fear and apprehension, predicated upon his assault of a deputy sheriff and his experience in prison, does not support his claim that his confession was involuntary.

---

[26]Petitioner was interrogated by Detective Jester of the Columbus Police Department and Deputy Justus of the Franklin County Sheriff's Department.

[27]Petitioner seemingly used workhouse and jail interchangeably throughout his confession.

[28]Exhibit 24E is a transcription of Petitioner's confession.

In sum, this Court concludes that the decision of the Ohio Supreme Court to reject the Petitioner's claim that his confession was involuntary was neither contrary to nor an unreasonable application of federal law.  In reaching that conclusion, this Court notes that the facts of this case are similar to those which caused the First Circuit to reject a similar claim in Coombs v. State of Maine, 202 F.3d 14 (1st Cir. 2000).  Therein, the First Circuit rejected the petitioner's claim that her confession was involuntary, predicated upon the allegation that an officer, Carter, had promised to flush the marijuana which had been in her possession if she confessed.  The First Circuit wrote:

> If the suppression court upheld the confession because it credited Carter's testimony that he had made no promise to flush the marijuana in return for Coombs's confession to theft, Coombs's case for federal habeas relief largely evaporates.  Such a state court finding of "basic, primary, or historical facts" based on a credibility determination is "presumed to be correct," subject only to rebuttal by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Id. at 18.  The petitioner argued that the state trial court had not necessarily failed to credit her testimony concerning such a promise, since it had not made an express finding on credibility.  The First Circuit rejected that argument, because the state appellate court had concluded that such a promise had not been made.  Id. at 19.  Herein, if the trial court had found Campbell to be credible, it would have believed his testimony that he had been threatened and mistreated, and, in all probability, his confession would have been excluded.

Accordingly, this Court overrules Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59), as they relate to Ground 11.  In addition, concluding that reasonable jurists would not find this

Court's assessment of this constitutional claim debatable or wrong, the Court denies Petitioner a certificate of appealability on same.

Based upon the foregoing, the Court sustains in part and overrules in part the Petitioner's Objections (Doc. #61) to the Report and Recommendations of the Magistrate Judge (Doc. #59). That judicial filing is adopted in part, as limited and supplemented herein,[29] and rejected in part. This matter is remanded to the Magistrate Judge for the purpose of issuing a report and recommendations on the question of prejudicial or harmless error, on the issue identified above. In addition, once this matter is in final form for judgment, this Court will grant Petitioner a certificate of appealability on sub-sub-claim 1.2 of Ground 1, sub-claim 1 of Ground 2 and sub-claim 1 of Ground 4.[30] In addition, the Court will grant Petitioner leave to appeal in forma pauperis.

The Magistrate Judge is free to adopt whatever schedule for briefing, decision-making and objections he deems advisable, within the following parameters—his Report and Recommendations on the remanded issue, with objections thereto and memorandum in support of his judicial filing, must reach this Court's desk within ninety (90) days of Monday, March 10, 2008. This Court will then have a decision on the remanded issue within thirty (30) days thereafter,

---

[29]In other words, this Court does not adopt the Report and Recommendations, as it relates to issues which the Court has not found it necessary to address.

[30]Of course, the Court has not addressed the question of a certificate of appealability on Ground 6, since it has not ruled upon that claim with finality.

together with a final judgment entry on this filing and the remanded issue, in a form suitable for appeal.

March 7, 2008

                                        /s/ Walter Herbert Rice
                                        WALTER HERBERT RICE, JUDGE
                                        UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.