# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ALVA E. CAMPBELL, JR.,

    Petitioner,

    -vs-

MARGARET BRADSHAW, Warden,

    Respondent.

Case No. 2:05-cv-193

District Judge Walter Herbert Rice
Chief Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS ON REMAND

This capital habeas corpus case is before the Magistrate on remand under Fed. R. Civ. P. 72(b).

On March 7, 2008, District Judge Walter Herbert Rice sustained Petitioner's Objections (Doc. No. 61) to the Report and Recommendations (Doc. No. 59) "as they relate to Ground 6, as defined and limited by the Petitioner in his Objections." (Decision and Entry, Doc. No. 66, at 51.) Judge Rice decided that the trial judge's actions had the effect of precluding the jury from considering voluntary intoxication as a mitigating factor by preventing his counsel from arguing to that effect and that this was error. *Id*. 49 and 51, citing *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Davis v. Coyle*, 475 F.3d 761, 771 (6th Cir. 2007). He thereupon remanded the case to the Magistrate Judge "on the question of whether the trial judge's decision to prevent Campbell from arguing voluntary intoxication as a mitigating factor constituted prejudicial or harmless error." *Id*. at 51-52.

The parties have now briefed the remanded question (Doc. Nos. 68, 69, 70, and 71).

-1-

**Harmless Error Standard**

Constitutional error in a habeas case is not required to be harmless beyond a reasonable doubt. Rather, error is harmless if the habeas court is satisfied it did not have a substantial and injurious effect or influence in determining the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), adopting standard from *Kotteakos v. United States*, 328 U.S. 750, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). This standard calls for reversal when the habeas court lacks a "fair assurance" that the outcome of a trial was not affected by error. *Beck v. Haik*, 377 F.3d 624 (6th Cir. 2004).

*Brecht* applies post-AEDPA "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]" *Fry v. Pliler*, ___ U.S. ___, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007)[1].

"In other words, a federal habeas court technically applies *Brecht* in light of AEDPA, but because the *Brecht* test is stricter (i.e., tougher on the petitioner) than AEDPA/*Chapman*, any petitioner that meets the *Brecht* standard will necessarily meet the AEDPA/*Chapman* standard. Thus, when conducting harmless-error review, we simply apply the *Brecht* standard and ask whether [the petitioner] has shown that the error had substantial and injurious effect in determining the jury's verdict." *Wilson v. Mitchell*, 498 F. 3d 491(6th Cir. 2007).

---

[1]By implication, *Fry* overrules *Eddleman v. McKee*, 471 F.3d 576, 583 (6th Cir. 2006), which held that AEDPA replaced the *Brecht* standard with the standard of *Chapman* plus AEDPA deference when a state court makes a harmless-error determination, relying on *Mitchell v. Esparza,* 540 U.S. 12, 17-18, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003).

In *Wilson*, the Sixth Circuit determined how harmless and harmful error should be distinguished:

> On the one hand, an error might be deemed harmless if it played such an inconsequential role in the actual trial in which it occurred that it assuredly had no impact on the trial's verdict. 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice & Procedure § 31.4d (5th ed. 2005). On the other hand, an error might be deemed harmless--even if it played an important role in the actual trial--if a hypothetical new trial absent the error would likely produce the same outcome as did the actual trial. *Id.*
>
> The Supreme Court has indicated that of these two meanings the proper one is the first (i.e., whether the error had an actual impact on the outcome), and not the second (i.e., whether a hypothetical new trial would likely produce the same result):
>
>> Consistent with the jury-trial guarantee, the question . . . the reviewing court [is] to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which "the jury actually rested its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered--no matter how inescapable the findings to support that verdict might be--would violate the jury-trial guarantee.
>
> *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (citations omitted) (quoting *Yates v. Evatt*, 500 U.S. 391, 404, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991)). Likewise, as the *Brecht* Court explained, "[t]he standard for determining whether habeas relief must be granted is whether . . . the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 623 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946) (emphasis added)).

*Wilson v. Mitchell,* 498 F.3d 491 (6th Cir. 2007).

When the habeas court is in grave doubt whether a trial error of federal constitutional law had a substantial and injurious effect or influence in determining the verdict, the error is not harmless and the writ must be granted. *O'Neal v. McAninch*, 513 U.S. 432, 115 S. Ct. 992, 130 L.Ed.2d 947 (1995).

> This inquiry does not assign an affirmative burden of proof on [petitioner], [O'Neal] at 436, nor does it require [petitioner] to show that the error was outcome-determinative, but instead "plac[es] the risk of doubt on the State." *Id.* at 439. *See also Ferensic v. Birkett*, 501 F.3d 469, 481 (6th Cir. 2007) (citing *O'Neal* for the proposition that "petitioners do not bear an affirmative burden of proof," and holding that "[u]ncertainty in answering this question . . . militates in favor of the habeas petitioner"); *Caldwell v. Bell,* 288 F.3d 838, 842 (6th Cir. 2002); *United States v. Baugham,* 371 U.S. App. D.C. 213, 449 F.3d 167, 177 (D.C. Cir. 2006).

*Gray v. Moore*, ___ F.3d ___, 2008 U.S. App. LEXIS 6186 (6th Cir. 2008). The parties do not disagree on the legal standard to be applied.

## ANALYSIS

### The Precise Question on Remand

The remanded question amounts to this: did precluding defense counsel from arguing that Campbell's alcohol consumption at the time of the murder mitigated his guilt have a substantial and injurious effect in producing the jury's death verdict in this case?

Two related questions which have been argued in this case at various stages are not included in the remanded question. First, it appears clear all parties understand Petitioner is no longer seeking relief because the trial judge refused a jury instruction on voluntary intoxication as a mitigating factor (See Decision and Entry, Doc. No. 66, at 46: "Petitioner concedes that "the trial court did not have to instruct on intoxication as a mitigating factor").

Secondly and more importantly, the remanded question is about argument to the jury on voluntary intoxication as a mitigating factor, not introduction of evidence of consumption of alcohol at the time of the murder or of the impact of alcohol on Petitioner's life generally. *Id*. ("Rather, Petitioner contends that he "has argued [that] the trial court's incorrect and improper finding that he was not intoxicated prevented him from presenting intoxication as a mitigating factor.") Although Respondent contended that Petitioner had waived any such claim by arguing only about the omitted jury instruction, Judge Rice concluded that the claim about jury argument had been fairly presented by the Petition. *Id*. at 48-49. Although the jury argument question was fairly presented here and the trial court record is clear that the trial judge precluded the argument and counsel did not make the argument, there is no claim and there is no record reference to any exclusion of evidence of alcohol consumption at the time of the offense.

## The Petitioner's Argument

Petitioner argues that alcohol consumption on the occasion of the murder was an essential part of the argument about how alcohol played a vital role in determining the whole course of Alva Campbell's life.

-5-

First, Campbell notes that he presented evidence at the penalty phase of the trial that both his parents were alcoholics whose alcohol consumption led to constant fighting between them and brutality and sexual abuse of his sisters by Campbell's father. Campbell's mitigation psychologist, Jeffrey Smalldon, explained to the jury how this affected Campbell and his trial counsel argued that effect in mitigation to the jury.

Second, Campbell himself was diagnosed as an alcoholic by Dr. Smalldon, although his alcoholism was in remission because he had been incarcerated. Campbell's sisters testified that, when he drank, it would bring out his rage at his father. Campbell refused to discuss with Dr. Smalldon whether he had any sort of rage reaction to Charles Dials, whom he kidnaped and held for more than two hours before killing him execution style. Despite Campbell's declining to sponsor any link between rage at his father and any reaction to Dials, his trial attorney was permitted to argue at length to the jury about the impact of these rage reactions on the crime (See Petitioner's Brief on Harmful Error, Doc. No. 69, at 9).

Third, Dr. Smalldon diagnosed Campbell with anti-social personality disorder, resulting in his having an impulsive thought process. *Id*. at 10. Trial counsel was able to argue that Campbell had an impulsive thought process and that his impulsivity was displayed in driving aimlessly around Columbus after he escaped, rather than leaving town. *Id*. at 11.

Petitioner claims that the impulsivity would have been affected by the alcohol consumption at the time of the murder, particularly because he had been off alcohol while locked up. He argues: "This is especially true for an alcoholic in remission who is exposed to alcohol after a lay-off from heavy drinking." *Id*. This seems to be an argument that the tolerance one builds up as a result of becoming an alcoholic is lost when the alcoholism is in remission, and that an alcoholic in remission

may be even more susceptible to the influence of alcohol than a non-alcoholic. This argument is not supported by any reference to evidence of record. If it were true and material, presumably Dr. Smalldon would have testified to it. As it was, trial counsel could not have legitimately made this argument in closing without some evidentiary support.

Petitioner emphasizes the impact of his alcohol consumption at the time of the offense by claiming in numerous places in his Brief that he was "intoxicated." See Brief on Harmful Error at 5, 6, 7 at n. 2, 9, 11, 12, 13, 14, and 15. However, there is no testimony, either lay or expert, that Campbell was "intoxicated" at the time of the murder. Instead, the testimony is that Campbell told the police he drank a forty ounce beer before shooting Dials; he did not claim he was drunk. His counsel argue "[t]he intoxicating effect of forty ounces of beer should not be dismissed." *Id*. at 11. But there is no testimony as to what the actual intoxicating effect of forty ounces of beer would have been on a man of Campbell's height, weight, history of alcohol consumption, and diagnosis of alcohol dependence in remission. The Court must weigh the precluded argument against the actual record evidence on alcohol consumption, not the unsupported conclusion that Campbell was "intoxicated."

The fact that the mitigating factor omitted in argument is generally labeled "voluntary intoxication" and that both the Ohio Supreme Court and Judge Rice use that label in referring to the omitted argument does not permit substituting labels for evidence. It is commonly known that different amounts of alcohol having differing effects on different people and that while even small amounts of alcohol may affect the mood of most persons, considerably more alcohol is needed to reach the medical or legal level of intoxication. See The Merck Manual at 1582 (17th ed. 1999).

Because experience with alcohol is widespread in the American population,[2] it is likely that jurors would have different reactions to evidence of consumption of different amounts of alcohol.

Against this factual background, the parties argue the weight of "voluntary intoxication" as a mitigating factor in various reported Ohio cases.

In this case itself, the Ohio Supreme Court found that voluntary intoxication was a weak mitigating factor. *State v. Campbell*, 95 Ohio St. 3d 48, 51 (2002), citing *State v. Otte*, 74 Ohio St. 3d 444 (1996). Petitioner argues that Otte's background – conventional middle class with opportunities for counseling and drug rehabilitation[3] – was very different from his own. He does not explain why that distinction would have made any difference to the jury. It seems much more likely that the crucial facts for the jury would have been what the Ohio Supreme Court discussed in discounting the alcohol consumption as mitigation:

> Campbell stated in allocution that he had killed Dials by accident. However, the evidence does not support this contention. "The murder of Charles Dials culminated a kidnapping that lasted over two hours." *Campbell I*, 90 Ohio St. 3d at 330-331, 738 N.E.2d at 1193. *Cf. State v. Keenan* (1998), 81 Ohio St. 3d 133, 140, 689 N.E.2d 929; *State v. D'Ambrosio* (1993), 67 Ohio St. 3d 185, 196, 616 N.E.2d 909. After carefully choosing the site of the murder, Campbell made Dials lie on the floor of the truck, then shot him at close range in the face and neck. As we said in *Campbell I*, 90 Ohio St. 3d at 330, 738 N.E.2d 1178, this was "a calculated, execution-style murder."

*Id.* Dials was not someone against whom Campbell had a long-standing grudge or someone with whom he got into a heated drunken argument. Instead, Dials was someone Campbell picked as a

---

[2] According to The Merck Manual, "an estimated 75% of American adults drink alcoholic beverages, . . ." *Id.* at 1581.

[3] Counsel fail to mention that the rehabilitation efforts were unsuccessful and Otte "spent his adolescence in and out of institutions." 74 Ohio St. 3d at 568.

-8-

victim because he was available when Campbell needed a truck. He eventually executed Dials when he concluded the police were closing in on him. The jury knew Campbell had consumed a 40 ounce bottle of beer about three hours before his confession[4] and knew about his and his parents' alcoholism. It is very unlikely that hearing an additional argument from his lawyer about his drinking on this occasion would have made a difference in their verdict.

Petitioner contrasts the Ohio Supreme Court's weighing of alcohol consumption in this case with that of the Court of Appeals in *State v. Haight*, 98 Ohio App. 3d 639 (Ohio App. 10th Dist. 1994). In *Haight*, the appellate court did not actually weigh the defendant's alcoholism and intoxication at the time of the murder against the aggravating factors. Instead, having reversed the judgment on a number of other grounds including seriously ineffective assistance of counsel, it instructed the trial court on remand to give significant weight to his alcoholism and the fact that he was drunk at the time of the murder. Comparing this case with *Haight*, Campbell argues this Court should have "'grave doubt' whether the trial court's excluding of this mitigating evidence as harmless." But that is not the question on remand. The trial court did **not** exclude evidence of Campbell's alcohol consumption. Rather, Judge Rice found it was error to preclude his trial counsel from arguing about the mitigating effect of that alcohol consumption. The question is whether precluding that argument, not the underlying evidence, was harmless.

Campbell argues little weight should be given to the Ohio Supreme Court's conclusion that alcohol consumption, even to the level of voluntary intoxication, is a weak mitigating factor because "these elected judges face the prospect of answering to the public if they issue an unpopular decision such as vacating a death sentence." (Brief on Harmful Error, Doc. No. 69, at 13). Of course, the

---

[4] See Trial Transcript reference quoted in Decision and Entry, Doc. No. 66, at 50, n. 23.

electorate to whom the Ohio Supreme Court is accountable is made up of the same persons who compose Ohio juries.  That is, the same Ohio voters who, by Petitioner's hypothesis, would vote against a justice for overturning a death sentence where the defendant was drunk at the time of the crime would themselves find the same defendant not deserving of capital punishment if they sat on his jury.  Petitioner's claim is about rhetorical force of a particular precluded argument.  Why should we conclude voters as jurors are rational and compassionate and would therefore accept the argument, but the same voters are irrational and vindictive when voting in judicial races?  And for that matter, the three judges who decided *Haight* were also elected by the same Franklin County voters who form the jury pool from which Campbell's jurors were chosen.

Campbell also presents a "lone juror" theory: "A lone juror could have rejected the death penalty based on the full 'mitigating effect' of this additional evidence[5] if Campbell had been permitted to present it in the penalty phase," citing *State v. Brooks*, 75 Ohio St. 3d 148, 661 N.E. 2d 1030, 1042  (Brief on Harmful Error, Doc. No. 69, at 16).  While it is certainly true that a single juror can prevent imposition of the death penalty by resolutely insisting on a life verdict, it must be remembered that the jury is a deliberative body and this Court must assess the likely impact on the jury as a whole.

---

[5]Petitioner here again misstates the question of remand: it is not about excluded evidence, but precluded argument.

**Respondent's Argument**

In contrast to the case authority cited by Petitioner, the Respondent notes a number of reported cases in which defendants have been sentenced to death despite proof amounting to intoxication in the medical sense, not just some consumption of alcohol. *See State v. Smith,* 97 Ohio St. 3d 367 (2002)(expert testimony by forensic toxicologist that on the night of the murder defendant's blood alcohol level would have been at least .36 and possibly as high as .60 and that defendant had a history of alcohol abuse)[6]; *State v. Johnson*, 112 Ohio St. 3d 210 (2006) (defendant claimed that on the day of the murder he consumed two 32-ounce containers of hard liquor or wine, $40 worth of crack cocaine and unspecified amounts of powdered cocaine and marijuana, and expert testified that defendant's intoxication could have affected defendant's judgment); *State v. Frazier,* 115 Ohio St. 3d 139 (2007) (evidence that defendant had a long history of drug and alcohol abuse and was drinking and using crack cocaine on the night before he murdered the victim); *State v. Hicks*, 43 Ohio St. 3d 72 (1989) (evidence that defendant "high" on cocaine when he killed the victim).

Petitioner responds to these citations by noting that "[t]he Warden offers no discussion of the other mitigating factors offered by each particular defendant." (Petitioner's Reply Brief on Harmful Error, Doc. No. 71, at 3.) But neither does the Petitioner. The Magistrate Judge's research reveals

- Smith had an absent biological father and, like Campbell, a physically abusive stepfather.

---

[6]The Merck Manual notes that medical intoxication occurs at blood alcohol levels of 150 to 200 mg/dL. Levels of 300 to 400 mg/dL induce unconsciousness and blood alcohol levels in excess of 400 mg/dL may be expected to be fatal. *Id*. at 1582.

      He raped and murdered a six-month old child. He had only a misdemeanor conviction record, in contrast to Campbell's prior conviction for aggravated murder.

- Johnson offered proof of severe mental illness (bipolar disorder), alcoholism, drug addiction, and consumption of drugs and alcohol at the time of the crime, and history as an abused and neglected child.
- Frazier, who also had Dr. Smalldon as a mitigation psychologist, was diagnosed with a depressive disorder, borderline intellectual functioning, and a history of polysubstance abuse. He was the product of a very unstable family and was beaten by his father. He had been abducted and sodomized by a stranger at the age of fourteen.
- Besides cocaine use at the time of the murder, the only other mitigation presented for Hicks was cooperation with the authorities upon arrest.

### Conclusion

      These cases are not untypical. It is not uncommon in capital aggravated murder cases to find a seriously dysfunctional family of origin, a history of substance abuse, and the use of alcohol at the time of the offense. Indeed, alcohol use at the time of the offense is implicated in a large percentage of felony cases of all types. In this case the jury heard the evidence about Campbell's dysfunctional family, which was not markedly more dysfunctional than many of the family backgrounds in these cases. It heard that he was an alcoholic, but that he was in remission because he had been incarcerated for a many years. It heard that he had consumed forty ounces of beer before killing Dials execution style and then going on to threaten to kill two others victims. It is very unlikely that

if it had heard the additional argument linking present alcohol use to the other mitigating factors it would have returned a life verdict.

Therefore the Court should conclude the trial judge's error in precluding argument about alcohol use was harmless in that it did not have a substantial and injurious effect on the verdict. The Petition should therefore be dismissed with prejudice.

What weight this particular argument would have had with a jury within the context of the particular factual record here is a question on which reasonable jurists could disagree. Petitioner should therefore be granted a certificate of appealability on the remanded question and allowed to appeal *in forma pauperis*.

April 19, 2008.

s/ <b>Michael R. Merz</b><br>Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

**Because Judge Rice has expressly decided that the remanded question must be ripe for his consideration by June 8, 2008, the deadlines for objections and responses thereto will be strictly enforced.**